No. 106,288

STATE OF KANSAS, *Appellee*, v. JIMMY DOMINGUEZ, *Appellant*.

(328 P.3d 1094)

Opinion filed May 23, 2014.

*Michelle A. Davis*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Amy L. Aranda*, first assistant county attorney, argued the cause, and *Marc Goodman*, county attorney, and *Derek Schmidt*, attorney general, were with her on the brief for appellee.

The opinion of the court was delivered by

LUCKERT, J.: Jimmy Dominguez appeals after a jury convicted him of premeditated first-degree murder, aggravated battery, and discharge of a firearm at an occupied building. He raises three claims of instructional error and one sentencing issue.

First, he argues clear error resulted from the trial court's failure to use the pattern jury instructions and pattern verdict form specifically designed for trials in which the State presents alternative theories of first-degree murder, *i.e.*, premeditated and felony murder. These pattern instructions inform the jurors that they must consider both alternative theories in arriving at a verdict on the charge of first-degree murder. In contrast, the trial judge in this case did not specifically instruct the jurors that they had to consider felony murder. Instead, the instructions suggested the jurors should only consider felony murder if they had a reasonable doubt regarding whether Dominquez was guilty of premeditated murder. Consequently, we have no confidence the jury appropriately considered the alternative of felony murder, and we are firmly convinced the jury would have reached a different verdict if the instructional errors had not occurred. We, therefore, reverse Dominguez' first-degree murder conviction.

In his other issues regarding jury instructions, Dominguez objects to the trial court's failure to give an accomplice instruction and an involuntary intoxication instruction. Based on these alleged errors, Dominguez asks us to reverse all of his convictions. While we find that it was error to not give the accomplice instruction, we hold the error was harmless. As to the involuntary intoxication instruction, we conclude the trial court did not err because there was not a factual basis for the instruction. Hence, we reverse only Dominguez' first-degree murder conviction, and we affirm his convictions for aggravated battery and discharge of a firearm at an occupied building.

Dominguez' final issue—that his hard 50 sentence should be vacated—is moot because Dominguez' hard 50 sentence relates to his first-degree murder conviction, which is being reversed. Therefore, his sentence is vacated without consideration of the merits of his arguments.

## Facts and Procedural Background

The events in this case occurred in the early morning hours of December 20, 2009, and culminated in the shooting death of Jose Antonio Leyva, a/k/a Samuel Torres Rosado, and the gunshot wounding of Juan Rosales, Jr. The law enforcement investigation led to the identification of Dominguez as the shooter and of Jorge Jurado as the potential instigator and an aider and abettor.

The shooting followed an altercation several hours earlier at a bar where the codefendants—Dominguez and Jurado—and the shooting victims—Leyva and Rosales—were drinking. Each of the men was in the company of others, many of whom testified at Dominguez' trial. The jury learned that Jurado was at the bar with his brother and their friend, Manuel Garcia-Velazquez, who came to the bar with Dominguez. Garcia-Velazquez testified that Jurado and Dominguez had not met before that night. Likewise, Leyva was at the bar with others, including his wife and his wife's sister, Rosa Arteaga, who was pregnant with Jurado's child. The other shooting victim, Rosales, was also at the bar with several of his family members.

The altercation began when two women started fighting. Leyva's wife and her sister, Arteaga, attempted to stop the fight, but Jurado pulled Arteaga away from the skirmish, later indicating he wanted to protect his unborn child. Leyva's wife objected to Jurado grabbing Arteaga and started calling Jurado names. Jurado then grabbed Leyva, and the two men began to argue. According to Jurado, he "just laughed" at Leyva and "didn't really say nothing to him, and [he] just told him [he] was trying to help." Garcia-Velazquez, however, heard "disgust words" or fighting words exchanged between Jurado and Leyva, and he, along with several others, separated the two men.

Rosales watched the altercation and testified that he could tell Jurado and Leyva "wanted to fight" and would have if they had not been restrained. Rosales asked Leyva what was going on, and Leyva told him he "was having an argument" with Jurado. Rosales then noticed Dominguez standing with Jurado. Because Rosales did not know Dominguez, Rosales asked Dominguez for his name; Dominguez replied, "I'm nobody," and turned away.

According to Jurado, a second altercation occurred when Leyva began arguing with a friend of Jurado. Jurado told his friend to calm down, gave him some money to buy drinks, and told him to leave Leyva alone. This resolution did not please Dominguez and others who were angry that Jurado "didn't do nothing" to Leyva, who had not shown proper "respect" to Jurado. Dominguez told Jurado he should have "whipped [Leyva's] ass." Jurado was over-heard saying that "he couldn't do anything while he was there at the bar because the cops were looking for him. But . . . once they left, he would take care of them and his homeboys would back him up."

At closing time, when all the patrons started leaving the bar, Leyva's wife saw Jurado talking to Dominguez and pointing to Leyva. Then, she saw Dominguez following them into the parking area. She thought Dominguez "cussed" at her before she got into a vehicle with Leyva.

After the bar closed, several of the patrons congregated at two separate parties. One party was at Leyva's house, and the other was at Jurado's house.

Dominguez and Garcia-Velazquez went to Jurado's house, where they continued to drink. During the party, Dominguez told Jurado he wanted to buy a gun. According to Jurado, he called his uncle who had an "SKS rifle" for sale. Jurado's uncle came over and met with Dominguez outside Jurado's house. Dominguez paid for the rifle, and Jurado's uncle placed the rifle in the passenger seat of an SUV that Jurado had borrowed from Arteaga.

Garcia-Velazquez gave a different account of how the rifle got into the SUV. He testified he saw Jurado walk from the back of the house carrying a blanket and, although he could not see what was inside the blanket, it looked like it was wrapped around some-thing. Garcia-Velazquez followed Jurado and got into the backseat of the SUV because Jurado had agreed to drive Garcia-Velazquez home. Dominguez was in the front passenger seat. Once in the SUV, Garcia-Velazquez realized the blanket was wrapped around an item that looked like the barrel of a long gun. He "didn't know what they were going to do with it [and] . . . didn't expect . . . that they would do something with it."

Jurado and Garcia-Velazquez also gave different versions of what happened once they were in the SUV with Dominguez. Jurado testified that Dominguez wanted to test-fire his newly purchased rifle, so Jurado drove out to the countryside. After testing the rifle, Jurado drove his passengers back into town; but before dropping them off, Jurado wanted to pick up Arteaga, who was at Leyva's house. Jurado testified that he did not tell his passengers that they would be stopping at Leyva's; although at another point in his testimony, he stated he told Dominguez he was going to pick up Arteaga from her sister's house. For his part, Garcia-Velazquez denied leaving town to test-fire the rifle. When Garcia-Velazquez recognized that Jurado was not driving him home, Jurado merely said that "[h]e had to pass by somewhere first" without telling the others where they were going.

Jurado drove through the alley behind Leyva's house and parked the SUV behind the detached garage. As Jurado turned off the headlights, he heard music playing inside the garage. Jurado began looking for his cell phone so he could call Arteaga. Meanwhile, Dominguez jumped out of the SUV with the rifle and ran to the side of Leyva's garage. Garcia-Velazquez testified that from inside the SUV he saw a door swing open on the garage. Light filtered out of the doorway, and a person exited through it. Dominguez then fired the rifle, and Garcia-Velazquez heard gunshots and saw "two flashes."

Rosales testified that just before he was shot, several men were partying in the garage. He and Leyva decided to step outside, and Leyva opened the door. Leyva was immediately and fatally shot in the abdomen, and Rosales was shot in the leg. There were no lights outside, so Rosales could only see "the light of the shooting" and somebody dressed in a black sweatshirt and a hat—clothing like he had seen Dominguez wearing at the bar.

Jurado started the SUV and "kind of took off" without Dominguez. Jurado stopped to pick up Dominguez after Jurado looked in his rearview mirror and saw Dominguez running down the alley. They returned to Jurado's house; and although Jurado and Garcia-Velazquez asked Dominguez what happened, Dominguez did not say anything. Garcia-Velazquez suggested that they go to his girl-

friend's house because nobody would try to look for them there. They stayed there until the next day, but nobody discussed the shooting.

The State filed criminal charges against Jurado and Dominguez. Dominguez was charged with the premeditated first-degree murder of Leyva or, in the alternative, felony murder; the attempted first-degree murder of Rosales; and discharge of a firearm at an occupied building. Jurado was charged with aiding and abetting first-degree murder and attempted first-degree murder. Jurado, however, entered into a plea agreement with the State. In exchange for his testimony, the State agreed to amend the charges against Jurado, and he pleaded no contest to solicitation to commit intentional second-degree murder and aiding and abetting the discharge of a firearm at an occupied building.

When Dominguez' case came to trial, Jurado testified as a State's witness. He acknowledged his plea arrangement and indicated he expected to receive a shorter sentence because of his agreement with the State, although he had not yet been sentenced. This trial resulted in a mistrial after the jury could not reach a verdict. Before Dominguez' retrial, Jurado was sentenced. At Dominguez' second trial, which is the subject of this appeal, Jurado was scheduled to be called as a witness, but he did not testify. Instead, Jurado invoked his right to remain silent under the Fifth Amendment to the United States Constitution. As a result, the trial court found Jurado unavailable as a witness and allowed the transcript of Jurado's testimony from the first trial to be read to the jury. Jurado's plea agreement was also admitted into evidence at the second trial.

The second jury convicted Dominguez of the premeditated first-degree murder of Leyva, in violation of K.S.A. 21-3401(a); the aggravated battery of Rosales, in violation of K.S.A. 21-3414(a)(1)(A), which was a lesser included offense of the charged offense of attempted first-degree murder; and discharge of a firearm at an occupied building, in violation of K.S.A. 21-4219(b). Dominguez received a controlling sentence of life imprisonment without the possibility of parole for 50 years.

Dominguez timely appealed, and this court has jurisdiction under K.S.A. 22-3601(b)(1) (off-grid crime; maximum sentence of life

imprisonment imposed). As we have noted, Dominguez raises four issues: (1) Did the trial court commit clear error in failing to give the pattern jury instructions and pattern verdict form specifically designed for trials in which the State presents alternative theories of first-degree murder to the jury? (2) Did the trial court commit clear error in failing to give a cautionary accomplice instruction? (3) Did the trial court commit clear error in failing to give a voluntary intoxication instruction? and (4) Is Dominguez' hard 50 life sentence unconstitutional because a jury did not determine the underlying facts?

## STANDARD OF REVIEW FOR JURY INSTRUCTION ISSUES

In *State v. Plummer*, 295 Kan. 156, 283 P.3d 202 (2012), this court set out a progression of analysis and the corresponding standards of review for deciding a jury instruction issue. "First, the appellate court should consider the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review." 295 Kan. 156, Syl. ¶ 1. Applying this step in this case, as we have indicated, we have jurisdiction to consider Dominguez' attack on his conviction, so our only concern is with preservation, which is addressed in K.S.A. 22-3414(3). Under that provision, the complaining party must have objected prior to jury deliberations in order to preserve appellate review of a claimed instructional error unless the objecting party is able to establish that the instruction or the failure to give the instruction was " 'clearly erroneous.' " *State v. Williams*, 295 Kan. 506, 512, 286 P.3d 195 (2012). Regardless of whether an objection has been stated, after considering jurisdiction and preservation, an appellate court must first determine whether there was error and, if so, the effect of the error on the verdict. 295 Kan. at 515-16 (discussing analysis if no objection was made); *Plummer*, 295 Kan. at 161-62 (discussing analysis if there was an objection).

In determining if there was error in giving or failing to give a jury instruction, an appellate court must examine whether the instruction was legally and factually appropriate. The appellate court utilizes an unlimited standard of review to analyze the legal question of whether the instruction fairly and accurately states the ap-

plicable law. See *Williams*, 295 Kan. 506, Syl. ¶ 4; *Plummer*, 295 Kan. at 161. Then, in considering whether the jury instruction was factually appropriate, an appellate court determines if there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support a factual basis for the instruction. *Williams*, 295 Kan. 506, Syl. ¶ 4; *Plummer*, 295 Kan. at 161. "Such an inquiry is closely akin to the sufficiency of the evidence review frequently performed by appellate courts in criminal cases." 295 Kan. at 162.

Finally, if the appellate court concludes the trial court erred in giving or failing to give the jury instruction, the appellate court must make a reversibility determination. If there was an objection, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011), *cert. denied* 132 S. Ct. 1594 (2012). *Plummer*, 295 Kan. at 162-63. If there was no objection, the test for clear error requiring reversal is "whether the reviewing court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." *Williams*, 295 Kan. at 516.

The assessment of whether an instructional error is clearly erroneous requires a review of the entire record and a de novo determination. The burden of showing clear error remains with the complaining party, rather than shifting to the party benefitting from the error as happens in a *Ward* harmless error analysis. 295 Kan. at 516.

These same considerations apply to jury verdict forms. See *State v. Burnett*, 293 Kan. 840, 847, 270 P.3d 1115 (2012) (citing *Unruh v. Purina Mills*, 289 Kan. 1185, 1197-98, 221 P.3d 1130 [2009]).

As we will discuss in more detail, Dominguez concedes the clearly erroneous standard applies to two of his instruction issues—the alternative theory instructions (and corresponding verdict form) regarding first-degree murder and the voluntary intoxication instruction—but he argues the more favorable *Ward* standard applies to the cautionary accomplice instruction issue.

## First-Degree Murder Instructions and Verdict Form

First, Dominguez argues the trial court erred by failing to give the jury the pattern jury instructions and pattern verdict form specifically designed for trials in which the State presents alternative theories of first-degree murder to the jury. See PIK Crim. 3d 56.02-A (felony murder and premeditated murder are two alternative theories to prove first-degree murder); PIK Crim. 3d 68.15 (verdict instruction where first-degree murder is presented in alternative theories); PIK Crim. 3d 68.16 (verdict form where first-degree murder is presented in alternative theories).

Dominguez concedes that he did not request the alternative theory instructions or verdict form, nor did he object to the instructions that were given by the trial court. Hence, he must meet the clear error standard. See K.S.A. 22-3414(3). Dominguez argues he has done so because the judge failed to convey to the jury—either through the jury instructions or the verdict form—that premeditated murder and felony murder are alternative theories of first-degree murder. Thus, according to Dominguez, the jury did not understand how to consider whether he was guilty of felony murder.

In response, by not arguing to the contrary, the State implicitly concedes that the alternative theory instructions and verdict form formulated by the PIK Committee were legally and factually appropriate. Nevertheless, citing *State v. Moncla*, 262 Kan. 58, 71, 936 P.2d 727 (1997), the State notes the use of PIK instructions is not mandatory. The State further argues the trial court's instructions in this case were proper, fairly stated the law, and could not have reasonably misled the jury.

Given the State's implicit concession as to the legal and factual appropriateness of the pattern alternative theory instructions and verdict form, we need not spend much time discussing the first two steps of the analysis, at least as those steps relate to the instructions that Dominguez says should have been given. We, too, conclude that the pattern alternative theory instructions and verdict form would have been legally and factually appropriate in this case and the trial court would not have erred if it had used them.

See *State v. Mireles*, 297 Kan. 339, Syl. ¶ 8, 301 P.3d 677 (2013) (first-degree murder encompasses the two alternative means of premeditated murder and felony murder); *State v. Starr*, 259 Kan. 713, 720, 915 P.2d 72 (1996) ("Premeditated and felony murder are not separate and distinct offenses but are two separate theories under which the crime of first-degree murder may be committed."); PIK Crim. 3d 56.02, Comment ("The statute merely provides alternative methods of proving the deliberation and premeditation which are required for a first-degree murder conviction under K.S.A 21-3401.").

What we must determine is whether the trial court's instructions adequately covered the essential information contained in those alternative theory pattern instructions—that is, whether the instructions that were given were legally appropriate. As this court has frequently stated, although the use of PIK instructions is generally not required, it is strongly recommended absent a particular need to alter the instructions because of the facts of a case. *State v. Dixon*, 289 Kan. 46, 67, 209 P.3d 675 (2009). This court has explained the wisdom of using the PIK instructions, stating: "When a district court ventures from the standard language of a pattern instruction, the court runs the risk of . . . omitting words that are essential to a clear statement of law." *State v. Tully*, 293 Kan. 176, 197, 262 P.3d 314 (2011).

To understand whether the result forecast in *Tully* occurred here, we need to examine what the jurors would have learned had they received the pattern alternative theory instructions and verdict form—PIK Crim. 3d 56.02-A, PIK Crim. 3d 68.15, and PIK Crim. 3d 68.16—and what the jurors were told through the trial court's instructions.

### Alternative Theory Instructions and Verdict Form

The first alternative theory instruction is PIK Crim. 3d 56.02-A, which explains that the defendant has been charged "with one offense of murder in the first degree and [the State] has introduced evidence on two alternate theories of proving this crime." It continues by setting out the two alternatives of felony murder and premeditated murder and informing the jurors: "Where evidence

is presented on the two alternate theories of proving the crime charged, you *must* consider both in arriving at your verdict." (Emphasis added.) PIK Crim. 3d 56.02-A. The instruction then directs the jurors to those instructions where the court has stated the elements of felony and premeditated first-degree murder. The instruction concludes by instructing the jury to enter a verdict of guilty if it determines the State has proven first-degree murder on either or both theories, to enter a verdict of not guilty if the State has failed to establish guilt on both theories, or, if applicable, to consider the defendant's guilt on lesser included offenses.

The Notes on Use to PIK Crim. 3d 56.02-A instruct: "Where the information and evidence include both felony murder and premeditated murder, *this instruction must be given* in addition to [the elements instructions found at] PIK [Crim.] 3d 56.01, Murder in the First Degree, and PIK [Crim.] 3d 56.02, Murder in the First Degree—Felony Murder." (Emphasis added.) In the present case, the trial court only gave the element instructions. It did not give the additional instruction found in PIK Crim. 3d 56.02-A.

The second alternative theory instruction, PIK Crim. 3d 68.15, guides the jurors on the order of their deliberations. It instructs them to first decide if the defendant is guilty of murder in the first degree and clearly directs them to determine whether one, both, or neither alternative theory was proven beyond a reasonable doubt. The instruction further explains that if first-degree murder is not proven beyond a reasonable doubt, the jury should consider the lesser included offenses instructed upon. The order for that consideration is then set out.

The Notes on Use to PIK Crim. 3d 68.15 indicate that the pattern instruction "should be given along with PIK [Crim.] 3d 68.16, Murder in the First Degree—Premeditated Murder and Felony Murder in the Alternative—Verdict Form, *when the defendant is charged with murder in the first degree under the alternative theories of premeditated murder and felony murder.*" (Emphasis added.) The verdict form found at PIK Crim. 3d 68.16 leads the jury step by step through the sequence of deliberations outlined in PIK Crim. 3d 68.15.

The pattern verdict form, PIK Crim. 3d 68.16, first requires the jury to determine whether the defendant is guilty of murder in the first degree. The jury is given three options, which are listed as Theory 1(a), 1(b), and 1(c): 1(a) "We, the jury, unanimously find the defendant guilty of murder in the first degree on the theory of premeditated murder"; 1(b) "We, the jury, unanimously find the defendant guilty of murder in the first degree on the theory of felony murder"; or 1(c) "We, the jury, unable to agree under Theory 1(a) or 1(b), do unanimously find the defendant guilty of murder in the first degree on the combined theories of premeditated murder and felony murder." PIK Crim. 3d 68.16. If the jury does not find the defendant guilty of first-degree murder, the verdict form then directs the jury to consider any lesser included offenses. There is also an option for the jury to sign the form indicating the defendant is not guilty.

The trial court in this case used neither PIK Crim. 3d 68.15, explaining the progression outlined on the verdict form, nor PIK Crim. 3d 68.16, the verdict form.

*Jury Instructions and Verdict Form Given at Trial*

The failure to give these instructions or use the corresponding verdict form resulted in the omission of significant points. The jury instructions that were given to the jury did not explain that first-degree murder has two alternative theories or that felony murder must be considered in reaching a verdict on the charge of first-degree murder. Further, if anything, the wording and ordering of the instructions made it appear that felony murder was a lesser included offense.

First, in Instruction No. 13, the trial court gave the elements instruction for premeditated first-degree murder, PIK Crim. 3d 56.01 (Murder in the First Degree). This instruction identified premeditated murder as murder in the first degree. It made no mention of felony murder.

The next instruction, Instruction No. 14, addressed the consideration of second-degree murder as a lesser included offense. In doing so, the court instructed: "Under Count One *you may find the defendant guilty of murder in the first degree, murder in the*

*second degree, felony murder or not guilty."* (Emphasis added.) The instruction explained that if "there is a reasonable doubt as to which of three offenses a defendant is guilty under Count One, he may be convicted of the lesser offense only." Instruction No. 14 was based on PIK Crim. 3d 68.09 (Lesser Included Offenses). The Notes on Use to PIK Crim. 3d 68.09 specify that "[t]his instruction *should not be used* when the crime is first-degree murder under the alternative theories of premeditated murder and felony murder. Instead use PIK [Crim.] 3d 68.15 and 68.16." (Emphasis added.)

As PIK Crim. 3d 68.09 indicates, this pattern instruction was intended to be used when the jury is instructed as to one principal offense and its lesser included offenses. Using this instruction in a case involving both theories of first-degree murder is obviously confusing. Moreover, as argued by Dominguez on appeal, the placement of felony murder after second-degree murder in the italicized portion of the jury instruction did not (1) explain when to consider felony murder or (2) clarify that premeditated murder and felony murder are simply alternative theories of first-degree murder. If anything, the instruction implied that the three charges—premeditated murder, second-degree murder, and felony murder—were to be considered sequentially, with felony murder being the last in the sequence.

The next jury instruction was the felony-murder instruction, Instruction No. 15, which was based on PIK Crim. 3d 56.02 (Murder in the First Degree—Felony Murder). It did not cure the misleading nature of the prior instructions. In fact, rather than explaining that felony murder is an alternative charge to premeditated murder and is a form of first-degree murder, the first words of the instruction were: "As an alternative charge to *Murder in the First Degree,* the defendant is charged in Alternative Count I with the crime of Felony Murder." (Emphasis added.) The remainder of the instruction correctly listed the elements of felony murder as stated in PIK Crim. 3d 56.02.

The statement that felony murder is an alternative to murder in the first degree was added by the trial court in place of language in the pattern instruction which states that "[t]he defendant is

charged with the crime of murder in the first degree." PIK Crim. 3d 56.02. This alteration was an apparent attempt to adapt the instruction to recognize alternative theories, but the alteration missed its goal because it did not explain that felony murder was an alternative basis for finding Dominguez guilty of first-degree murder; instead, the altered instruction indicated felony murder was something different than first-degree murder.

Next, the trial court gave Instruction No. 16, which again addressed the jury's consideration of second-degree murder and stated, in part, that "[i]f you do not agree that the defendant is guilty of murder *in the first degree,* you should consider the lesser included offense of murder in the second degree." (Emphasis added.) This instruction informed the jury that second-degree murder is a lesser included offense of first-degree murder, which is the term the trial court used to identify only premeditated murder. But, as Dominguez notes, Instruction No. 16 did not explain the hierarchical relationship between second-degree murder and felony murder.

Like the combination of instructions used by the trial court, the verdict form did nothing to clarify that premeditated murder and felony murder are alternative theories of first-degree murder. Nor did it clarify the appropriate sequencing for the jury's deliberations. This is true even though the transcript of the instructions conference shows the prosecution expressed concern that the jury would be confused about whether felony murder is a "higher-level felony" than second-degree murder. After this concern was expressed, the court agreed to swap the sequencing in one part of the verdict form and listed felony murder after premeditated murder and before second-degree murder. The resulting form provided the options of finding Dominguez (1) "guilty of murder in the 1st degree as charged in Count One"; (2) "guilty of felony murder as charged in Alternative Count I"; (3) "guilty of murder in the 2nd degree"; or (4) "not guilty under Count I, 1st Degree Murder, the lesser included offense of 2nd Degree Murder and Alternative Count I, Felony Murder." In stating these options, the verdict form, again, did not identify felony murder as first-degree murder. Furthermore, any ameliorating impact of the reordering of the first three

options was wiped out by a subsequent listing of the offenses in option four on the verdict form, which listed felony murder *after* second-degree murder. Hence, at best, the verdict form was ambiguous and, at worst, a portion of the verdict form implied that the three charges were to be considered sequentially, with felony murder being the last in the sequence.

Simply put, neither the jury instructions nor the verdict form in this case provided the jurors with information that allowed them to understand the need to consider felony murder as part of their deliberations regarding the first-degree murder charge. Further, as Dominguez argues, the sequencing of instructions and words within the instructions suggested that felony murder was not on "equal footing" with premeditated murder. Consequently, we conclude the instructions given by the trial court were legally inappropriate and, therefore, erroneous.

*Reversibility Inquiry*

The final step in our analysis is the reversibility inquiry. As Dominguez concedes, because he did not object to the instructions, he must persuade us to the point we are "firmly convinced that the jury would have reached a different verdict had the instruction error not occurred." See *Williams*, 295 Kan. at 516. He does so, although we do not accept all of his arguments.

Principally, we do not agree with Dominguez' argument that the jury's verdict on the lesser included offense of aggravated battery as to the shooting of Rosales, rather than the charged offense of attempted first-degree murder, was inconsistent with a verdict of premeditated murder as to Leyva. There was substantial evidence from which premeditation could be inferred as to the killing of Leyva—the earlier fight, Jurado's statements about getting Leyva later with his "home-boys" backing him up, and Dominguez' efforts at acquiring a gun. See *State v. Haberlein*, 296 Kan. 195, 205, 290 P.3d 640 (2012) (" 'premeditation and deliberation may be inferred from the established circumstances of a case, provided the inference is a reasonable one.' "), *cert. denied* 134 S. Ct. 148 (2013). Nothing in the record suggests the same level of antago-

nism toward Rosales, and the jury could have believed that Dominguez did not have the intent to kill Rosales.

Nevertheless, we do not accept the State's arguments either. The State, in its appellate brief, recognizes this court and the Court of Appeals have reversed verdicts when jury instructions failed to accurately convey the appropriate sequencing of jury deliberations, but the State argues these cases are distinguishable. The two cases discussed by the State are *State v. Miller*, 293 Kan. 46, 259 P.3d 701 (2011), and *State v. Cribbs*, 29 Kan. App. 2d 919, 34 P.3d 76 (2001).

In *Miller*, the defendant, who was charged with premeditated first-degree murder, requested instructions for second-degree murder and voluntary manslaughter as lesser included offenses. In one instruction, the trial court correctly instructed the jury to simultaneously consider the two lesser included offenses; but in a separate, conflicting instruction, the court erroneously told the jury that it could consider voluntary manslaughter only if it could not agree as to the defendant's guilt on the second-degree murder charge. This court found reversible error, in part because one could not presume the jury followed the correct instruction—the simultaneous consideration of the lesser included offenses—and disregarded the improper instruction. 293 Kan. at 53. Further, during closing arguments, "both the prosecutor and defense counsel separately discussed first-degree murder, second-degree murder, and voluntary manslaughter in that order, implying that the crimes should be considered sequentially." 293 Kan. at 53-54. And the verdict form "did nothing to clarify the contradictory instructions." 293 Kan. at 54.

In the second case cited by the State, *Cribbs*, the Court of Appeals held that second-degree murder and voluntary manslaughter must be considered simultaneously during a jury's deliberations. Applying this holding, the court found the trial court erred because it essentially told the jury "it need not bother considering attempted voluntary manslaughter unless and until it failed to agree on his guilt of attempted second-degree murder." 29 Kan. App. 2d at 924. This " 'reordering' deprived the jury of the opportunity to consider the mitigating circumstances of heat of passion or sudden

quarrel which reduce an intentional homicide from murder to voluntary manslaughter." *State v. Graham*, 275 Kan. 831, 836-38, 69 P.3d 563 (2003) (discussing *Cribbs*).

As the State points out, the trial court in this case did not include a blatant misstatement of the law in the instructions such as found in *Miller* or *Cribbs*. The same distinction applies to yet another case, which was not cited by the parties, *State v. Young*, 277 Kan. 588, Syl. ¶ 5, 87 P.3d 308 (2004). In *Young*, the trial court explicitly instructed the jury that felony murder is a lesser included offense of premeditated murder. In contrast, the trial court's error in this case was more of omission than commission. Nevertheless, the instructions in this case essentially suggested the same thing as the trial court's misstatement in *Young*, *i.e.*, that felony murder is a lesser included offense of premeditated first-degree murder. This is especially true given the sequence of the jury instructions and the listing of felony murder after second-degree murder in Instruction No. 14 and in part of the verdict form. Overall, the instructions left the impression that felony murder was to be considered after premeditated first-degree murder and second-degree murder. Plus, there was no affirmative statement explaining that felony murder is first-degree murder or that felony murder had to be considered before the verdict was reached on first-degree murder. In other words, while the State draws a point of distinction, the distinction has no significance.

The State also contrasts the circumstances of this case to those in *Miller* where the attorneys' closing arguments reinforced the misstatement; in this case, the prosecutor correctly explained that felony and premeditated murder are "different theories" of first-degree murder and told the jurors that if they found "neither of them, then you would move to second degree." While these statements were helpful, they still did not explain that the jury had to consider felony murder as well as premeditated first-degree murder before reaching a verdict on Count I. Also, while appellate courts presume a jury follows the trial court's instructions—especially given that the jurors in this case were instructed that they *must* apply the instructions—there is no similar presumption relating to arguments of counsel. See PIK Crim. 3d 51.02 (Consid-

eration and Binding Application of Instructions); see also K.S.A. 22-3403(3); *State v. McClanahan*, 212 Kan. 208, 215-17, 510 P.2d 153 (1973).

We, therefore, find ourselves with the same concern that arose in *Miller*, *Cribbs*, and *Young*—the jury was either misdirected or lacked direction regarding the order of its deliberations. In the circumstances of this case, that meant the jury was not told it had to simultaneously consider the alternative theories of first-degree murder. Such a situation does not always lead to reversal, however. In *Young*, this court concluded "there was no reasonable possibility that the jury would have rendered a different verdict if the district court had not made the mistake of calling felony murder a 'lesser offense' of premeditated murder." 277 Kan. at 597.

We do not reach the same conclusion under the facts of this case for several reasons, however. First, we note that, although not discussed by Dominguez, the trial court also instructed the jury in Instruction No. 21 that "[e]ach crime charged against the defendant is a separate and distinct offense." Instruction No. 21 was based on PIK Crim. 3d 68.07 (Multiple Counts-Verdict Instruction)—an instruction that is not to be given when a defendant is charged under alternative theories of first-degree murder. See PIK Crim. 3d 68.15, Notes on Use. This clearly is a misstatement of the law, since premeditated murder and felony murder are theories relating to the same offense, first-degree murder. Second, there was substantial evidence of the underlying felony, criminal discharge of a firearm at an occupied building. Hence, under the facts of this case, we are firmly convinced the jury would have reached a different verdict. This conclusion is buttressed by the fact the jury empanelled in Dominguez' first trial was unable to unanimously agree on whether Dominguez was guilty of premeditated murder or felony murder.

One may ask whether this difference in the verdict would matter because under any of the three alternatives the jury should have been given—(1) unanimously finding Dominguez guilty of premeditated first-degree murder, (2) unanimously finding him guilty of first-degree felony murder, or (3) unanimously finding him guilty of first-degree murder but splitting votes between the two

alternative theories—Dominguez would have been guilty of first-degree murder. The answer is that the verdict would have had a significant impact on Dominguez' minimum sentence. The legislature has chosen to impose a different minimum sentence for first-degree felony murder—at the time of Leyva's death a 20-year minimum—than for premeditation first-degree murder—up to a 50-year minimum. See K.S.A. 21-3401 (murder in first degree is off-grid person felony); K.S.A. 21-4635(b) (conviction of first-degree murder based upon finding of premeditation subject to mandatory term of up to 50 years imprisonment); K.S.A. 21-4706(c) (sentence for off-grid crimes shall be imprisonment for life); K.S.A. 2013 Supp. 22-3717(b)(2) (20-year minimum for life sentence with exceptions including K.S.A. 21-4635). Further, if the jury would have found Dominguez guilty of first-degree murder based on a combination of votes for the two alternative theories, the sentencing court could have only imposed a sentence for felony murder. See *State v. Wakefield*, 267 Kan. 116, 140-41, 977 P.2d 941 (1999) ("Where the sentencing court cannot ascertain whether the jury unanimously convicted the defendant of both premeditated murder and felony murder, but the jury convicted the defendant of the inherently dangerous underlying felony, the sentencing court may not sentence the defendant for premeditated murder but must impose the sentence for felony murder"; where jury unanimously found defendant guilty of premeditated murder and felony murder, sentence for premeditated murder is not illegal); *State v. Vontress*, 266 Kan. 248, 264, 970 P.2d 42 (1998) (same), *disapproved on other grounds by State v. Schoonover*, 281 Kan. 453, 133 P.3d 48 (2006).

Consequently, Dominguez has established clear error, and we reverse his conviction for first-degree murder and remand the case to the trial court.

## ACCOMPLICE INSTRUCTION

Next, Dominguez argues that the trial court erred in failing to give PIK Crim. 3d 52.18, which instructs the jury to consider an accomplice's testimony with caution. Dominguez argues that Jurado, having been found guilty of crimes related to the shooting

death of Leyva and the wounding of Rosales, was clearly an accomplice and, consequently, the instruction was legally and factually appropriate. The State agrees that Jurado was involved in the crimes and was an accomplice, but it argues the instruction was not legally appropriate because Jurado was also a codefendant. It bases its argument on the Notes on Use for PIK Crim. 3d 52.18, which state: "This instruction should not be given when the accomplice is also a co-defendant."

The trial court discussed this PIK Committee notation with counsel during the instructions conference and also pointed out the Court of Appeals' decision on which it is based, *State v. Land,* 14 Kan. App. 2d 515, 794 P.2d 668 (1990). Dominguez' counsel responded by saying, "[S]ince [Jurado] wasn't a codefendant charged in this particular case, he's not a codefendant, but I think it's very disingenuous of me to say that." The trial court thanked counsel for his candor, ruled that Jurado was a codefendant, and determined that PIK Crim. 3d 52.18 would not be given in light of the PIK Committee's Notes on Use and the holding in *Land.*

On appeal, Dominguez asks us to adopt the argument his trial counsel labeled as disingenuous. While that situation makes us initially skeptical, we ultimately conclude Dominguez' appellate argument is correct and the instruction should have been given. To explain, we need to discuss the holding in *Land,* which provides context to the Notes on Use to PIK Crim. 3d 52.18, and to clarify that the holding is limited to situations where two or more accomplices are on trial before the same jury.

### Legally and Factually Appropriate

In *Land,* 14 Kan. App. 2d 515, Sonja L. Land was prosecuted in a joint trial with two other codefendants and was the only defendant who testified. Although the State's theory was that Land was an accomplice, making the cautionary accomplice instruction applicable, Land argued it would be inappropriate to instruct the jury to view any accomplice's testimony with caution. The Court of Appeals agreed, stating the instruction "was not neutral . . . . [I]t arbitrarily singled out [the defendant's] testimony and would

cause a jury to scrutinize it differently than other testimony." 14 Kan. App. 2d at 520.

Dominguez does not question the soundness of the holding in *Land* but argues it should be limited to situations in which accomplices are jointly tried. We agree. The *Land* court's concern about undermining the testimony of a defendant only arises in cases where two or more accomplices are on trial before the same jury. In contrast, in the present case, an accomplice instruction would not have singled out Dominguez, who was the only defendant in the case. Further, the State offers no justification for extending the *Land* rationale to a situation where only one accomplice is on trial.

Also, while the Notes on Use do not distinguish between accomplices in the same trial and accomplices who are tried separately on charges based on the same criminal activity, other authorities do. Our decisions have stressed that the better practice is to give the cautionary instruction regardless of whether there is corroborating evidence, "as long as the accomplice is not also a *codefendant in the trial*." (Emphasis added.) *State v. Llamas*, 298 Kan. 246, 262-63, 311 P.3d 399 (2013) (citing PIK Crim. 3d 52.18, Notes on Use); see *State v. Tapia*, 295 Kan. 978, 996, 287 P.3d 879 (2012) (same); *State v. Simmons*, 282 Kan. 728, 734, 148 P.3d 525 (2006) (same); see also *State v. Buehler-May*, 279 Kan. 371, 384-85, 110 P.3d 425 (discussing the fact that two accomplices were questioned at defendant's trial about their plea bargain arrangements in front of the jury; trial court's failure to give cautionary accomplice instruction was not clearly erroneous; no characterization of witnesses as codefendants), *cert. denied* 546 U.S. 980 (2005).

In addition, "codefendant" is defined in Black's Law Dictionary 293 (9th ed. 2009) as "[o]ne of two or more defendants sued in the same litigation or charged with the same crime." Admittedly, we are often imprecise in referring to "codefendants" simply because charges arise from the same criminal act, even if the defendants are not charged in the same case or with the same crimes. Regardless, the definition does not fit in this case: Jurado and Dominguez were not charged in the same case or with the same crimes, although the State did file charges against both men involving the same victims and the same event.

Moreover, the facts of this case underscore the appropriateness of distinguishing between an accomplice whose guilt or innocence will be determined by the jury which hears the accomplice's testimony and an accomplice whose guilt or innocence is not being judged by the jury hearing the testimony. A jury has reason to view with caution the testimony of an accomplice who, like Jurado, received a benefit from testifying—the State's agreement to amend charges to a lesser included offense in exchange for testimony. In fact, this is exactly the situation the cautionary instruction is designed to address. And it did so without singling out Dominguez, who chose not to testify in his defense.

In summary, the trial court erred in extending the holding in *Land* to circumstances where an accomplice is not being tried before the same jury.

*Not Reversible Error*

We must next determine whether this error requires us to reverse all of Dominguez' convictions. In arguing for reversal, Dominguez suggests he is entitled to the more favorable harmless error standard of review instead of the clearly erroneous standard applied in Issue I. See K.S.A. 22-3414(3); *State v. Plummer*, 295 Kan. 156, 162-63, 283 P.3d 202 (2012). He bases this position on the fact he requested the instruction.

Nevertheless, as we have discussed, Dominguez' counsel also told the trial court it was disingenuous to suggest the instruction was appropriate. Under those circumstances, we conclude Dominguez is not entitled to the more favorable standard of review. This court recently considered a situation where defense counsel stated that he was " 'not going to agree' with not giving the instruction" but did not advance any legal arguments that would have explained why the instruction should be given. *State v. Littlejohn*, 298 Kan. 632, 316 P.3d 136 (2014). This court found Littlejohn's situation akin to one where a defendant objects to an instruction on one ground at trial but asserts a different argument on appeal. In those circumstances this court has held the clearly erroneous standard of review applies. 298 Kan. at 644-46; see *State v. Ellmaker*, 289 Kan. 1132, 1139, 221 P.3d 1105 (2009), *cert. denied*

560 U.S. 966 (2010); see also *Tapia*, 295 Kan. at 995 (clearly erroneous standard of review applied on appeal to defendant's jury instruction issue when defendant's request for jury instruction before district court was interpreted as being so indistinct as to not clearly communicate the request or, alternatively, as being different from the request being made on appeal).

In the same way, a clearly erroneous standard of review applies in the present case where Dominguez basically conceded at the instructions conference that the instruction was not appropriate. See K.S.A. 22-3414(3); *State v. Marshall*, 294 Kan. 850, 867, 281 P.3d 1112 (2012). Hence, reversal is only required if we are firmly convinced the jury would have reached a different verdict had the instruction been given. Dominguez maintains the burden of establishing clear error under K.S.A. 22-3414(3). See *State v. Williams*, 295 Kan. 506, 515-16, 286 P.3d 195 (2012). He fails to carry this burden.

This court has stated:

"[N]o reversible error occurs due to a trial court's failure to give a cautionary accomplice witness instruction if a witness' testimony is corroborated by other evidence and the witness' testimony does not provide the sole basis for a resulting conviction. [Citations omitted.]. . .

"Further, a failure to provide the jury with the cautionary accomplice witness instruction of PIK Crim. 3d 52.18 is not error when the defendant's guilt is plain or when the jury is cautioned about the weight to be accorded testimonial evidence in other instructions. [Citation omitted.]" *Simmons*, 282 Kan. at 740.

Consequently, we begin our analysis by examining the extent and importance of Jurado's testimony, as well as any corroborating testimony. See *Tapia*, 295 Kan. at 996-97; *State v. DePriest*, 258 Kan. 596, 605, 907 P.2d 868 (1995); *State v. Moore*, 229 Kan. 73, 80-81, 622 P.2d 631 (1981); see also *State v. Moody*, 223 Kan. 699, 702-03, 576 P.2d 637 (failure to give accomplice instruction can create trial error, particularly when the accomplice testimony is uncorroborated), *cert. denied* 439 U.S. 894 (1978).

While Jurado's testimony was damaging to Dominguez' defense, it was largely corroborated by Garcia-Velazquez' testimony. The one significant point of disagreement between Jurado and Garcia-Velazquez was how the rifle came to be in the SUV: Jurado testified

that Dominguez wanted to buy a gun, so Jurado contacted his uncle who sold the rifle to Dominguez behind Jurado's house and placed it inside Jurado's SUV; Garcia-Velazquez testified Jurado carried the rifle wrapped in a blanket from inside the house and took it out to Jurado's SUV. Garcia-Velazquez' version is arguably more favorable to Dominguez on the element of premeditation. Nevertheless, the evidence was undisputed that it was obvious there was a rifle in the SUV, and Dominguez would have been aware of the rifle's presence from the time they left the party until they drove to Leyva's house. Even under Garcia-Velazquez' explanation, the jury could infer Jurado and Dominguez had discussed taking the gun with them and had a plan and purpose for doing so. Also, defense counsel cross-examined Jurado on the inconsistency between his version of how Dominguez acquired the rifle and Garcia-Velazquez' version, and Jurado admitted that if his uncle were questioned about the firearm sale, he would probably not corroborate Jurado's version.

Witnesses other than Garcia-Velazquez corroborated many other aspects of Jurado's testimony. Rosales identified the shooter as being dressed in clothes like those worn earlier in the evening by Dominguez. Also, several witnesses testified to Dominguez' reaction when, in Dominguez' view, Jurado had not stood up for himself when Leyva failed to show Jurado a proper level of respect at the bar. Rosales and others testified to the exchange between Leyva and Jurado, and Leyva's wife testified she believed Dominguez had cussed at her and Leyva as they were leaving the bar.

In addition, defense counsel in the first trial had effectively called into question Jurado's veracity, and the entire transcript, including defense counsel's cross-examination of Jurado, was read into the record at the second trial. Defense counsel had elicited that Jurado was initially charged with more serious offenses—aiding and abetting first-degree murder, criminal discharge of a firearm at an occupied building, and solicitation to commit intentional second-degree murder—and Jurado avoided longer prison time by pleading no contest to solicitation to commit the second-degree murder of Leyva and aiding and abetting the discharge of a firearm at an occupied building belonging to Leyva. Also, on cross-exami-

nation Jurado admitted he had lied to investigating law enforcement officers. Finally, defense counsel questioned Jurado about why he fled the community after the shooting if he had done nothing wrong and why he pleaded guilty to offenses, such as solicitation to commit second-degree murder. (Jurado actually pleaded no contest.)

In addition to the thorough cross-examination of Jurado and the corroboration of some of Jurado's testimony through other witnesses, the jury was given the general jury instruction on witness credibility. Instruction No. 2, which conformed to PIK Crim. 3d 51.04 (Consideration of Evidence), stated, in part: "In your fact finding you should consider and weigh everything admitted into evidence. This includes testimony of witnesses." Finally, there was strong evidence of Dominguez' guilt on the charges of aggravated battery and discharge of a firearm at an occupied building.

Considered in this light, Dominguez fails to convince us that the cautionary accomplice instruction would have changed the jury's verdict.

## Voluntary Intoxication Instruction

For his final issue regarding the jury instructions, Dominguez argues that the trial court committed clear error in failing to give a voluntary intoxication instruction. See PIK Crim. 3d 54.12-A-1 (instructing that voluntary intoxication may be a defense where "the evidence indicates that such intoxication impaired a defendant's mental faculties to the extent that [he][she] was incapable of forming the necessary state of mind").

### Legally and Factually Appropriate

First, we must consider whether it was error to fail to give the instruction. This inquiry requires us to consider whether the voluntary intoxication instruction was legally and factually appropriate.

As to legal appropriateness, a defendant may rely on the defense of voluntary intoxication when the crime charged requires a specific intent. *State v. Gadelkarim*, 247 Kan. 505, Syl. ¶ 1, 802 P.2d 507 (1990). In a proper case, such as one involving a charge of premeditated first-degree murder, voluntary intoxication may be

used as a valid defense and would, therefore, be legally appropriate. See *Ellmaker*, 289 Kan. at 1142 (State required to prove specific intent to kill and premeditation to convict a defendant of premeditated first-degree murder).

The stumbling block Dominguez faces, however, is that a voluntary intoxication instruction was not factually appropriate. Notably, voluntary intoxication is not a valid defense if there is no evidence presented to demonstrate that the defendant was so intoxicated that his or her ability to form the requisite intent was impaired. *State v. Hernandez*, 292 Kan. 598, 607, 257 P.3d 767 (2011); *State v. Johnson*, 258 Kan. 475, 485-86, 905 P.2d 94 (1995), *overruled on other grounds by State v. Everett*, 296 Kan. 1039, 297 P.3d 292 (2013); *State v. Brown*, 258 Kan. 374, 386, 904 P.2d 985 (1995); see also *State v. Kessler*, 276 Kan. 202, 210-11, 73 P.3d 761 (2003) (in order for voluntary intoxication instruction to be required, there must be evidence defendant was so intoxicated he or she was robbed of mental faculties).

Here, Dominguez bases his argument on evidence that he had been drinking at the bar and Jurado's party. But this evidence does not establish how much alcohol Dominguez drank. More critically, Dominguez points to no evidence presented at trial that would have convinced a jury he was so intoxicated as to be unable to form the specific intent necessary for the commission of premeditated first-degree murder. See *Hernandez*, 292 Kan. at 607 (evidence that defendant consumed alcohol and marijuana, or that defendant was " 'high' " or " 'intoxicated' " does not permit an inference that defendant was so impaired that he was unable to form requisite intent). In fact, there was testimony that just before the shootings, Dominguez was communicating with Jurado and test-firing the rifle.

Without more, Dominguez' voluntary intoxication arguments fail. We, therefore, conclude a voluntary intoxication instruction was not factually appropriate in this case. Therefore, there is no need to move to the reversibility step of the clearly erroneous standard of review. The trial court's failure to give the instruction was not clearly erroneous.

## Hard 50 Sentence

Finally, Dominguez argues his hard 50 sentence is unconstitutional because a jury did not determine the underlying facts that allowed for increasing his minimum sentence. We do not reach this issue, however, because we are reversing Dominguez' first-degree murder conviction. The result of this reversal is that his hard 50 sentence for first-degree murder must be and is vacated. Consequently, his attack on his hard 50 sentence is moot and will not be addressed. See *State v. Montgomery*, 295 Kan. 837, 840, 286 P.3d 866 (2012) (as a general rule, appellate courts do not decide moot questions).

## Conclusion

In summary, we reverse Dominguez' first-degree murder conviction and vacate his hard 50 sentence for first-degree murder. We affirm his convictions for aggravated battery and discharge of a firearm at an occupied dwelling.

Affirmed in part, reversed and vacated in part, and remanded.