NOT DESIGNATED FOR PUBLICATION

Nos. 111,981
111,982

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee,*

v.

PHILLIP CASTRO,
*Appellant*.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; ROBERT P. BURNS, judge. Opinion filed January 8, 2016.
Affirmed.

*Randall L. Hodgkinson*, of Kansas Appellate Defender Office, for appellant.

*Shawn M. Boyd*, assistant district attorney, *Jerome A. Gorman*, district attorney, and *Derek Schmidt*, attorney general, for appellee.

Before SCHROEDER, P.J., PIERRON, J. and HEBERT, S.J.

*Per Curiam*:  Phillip Castro appeals his convictions by a jury of criminal discharge of a firearm at an occupied building, aggravated battery, and criminal possession of a firearm by a convicted felon. He requests a new trial, alleging that the district court erred in instructing the jury and that the evidence was insufficient to support the convictions. He also requests reconsideration of the district court's revocation of his probation in a prior case due to his current convictions.

1

We find Castro has not established that he is entitled to a new trial, and, accordingly, we affirm the convictions. In light of that disposition, we do not address the issue of probation revocation.

*Factual and Procedural Background*

In the early evening hours of October 7, 2012, brothers Emmanuel and Daniel Valadez heard an unfriendly pounding at the front door of their duplex in Kansas City. The brothers, at least one of whom (Daniel) had just taken some drags from a marijuana cigarette, went to the door to find out who it was but got no response. As the pounding continued, Daniel went and glanced through his bedroom window onto his front porch where he saw two men he knew. One man, Roberto Garcia, was holding a handgun as he pounded and kicked the door. The other man, Phillip Castro, stood behind Garcia with one foot on the front step, holding a bigger gun down to his side, which Daniel described as similar to a shotgun or assault rifle that was 3-to-4 feet long. Daniel assumed the men were there to collect a $600 debt that Daniel owed to Castro, who Daniel had met in person once a few months prior.

Daniel's attempts to calm the situation upon his return to the front door failed, and the pounding was replaced by bullets coming through the door and walls of the duplex. One of those bullets went through Daniel's left thigh as he stood just feet from the door. After Daniel's failed attempts to help his girlfriend, who had been napping in his bedroom, he and Emmanuel ran through the kitchen and out the back door, separating once outside.

Daniel fled up the alley, stopping at the first occupied residence he found and sitting down on the driveway, still within sight distance of the duplex. From there, Daniel saw Castro run down the back stairway carrying the rifle just before he heard several more gunshots. Daniel then got up and started to travel toward his mother's home. After

hearing sirens approaching, Daniel switched direction and ran back to the front of his duplex. There, on the steps, he found Emmanuel sitting in the middle of the steps, severely wounded and gasping for air.

Emmanuel had been shot multiple times after fleeing the duplex. Some of his wounds came after he tried to hide in the bottom of a staircase under their back porch after running out of the back of the house. By that time, the men had broken through the front door and ran through the house after the brothers. The man with the handgun soon found Emmanuel hiding in the staircase. The man repeatedly fired at Emmanuel from the top of the stairs, hitting him in the legs seven or eight times and his left testicle once. Emmanuel did not realize he had been shot as he scrambled to escape the barrage of bullets. He managed to run up his neighbor's staircase to the other side of the duplex, where he hid by a central air conditioning unit. Believing the shooters had left, Emmanuel tried to return to the front porch. But the shooters were not gone. Emmanuel soon encountered the man with the bigger gun, who fired seven or eight shots at Emmanuel from 8-to-10 feet away, striking him once in his chest and once in his stomach. The man then fled.

Daniel was able to identify Garcia and Castro as the men at their duplex with guns that day. He consistently did so immediately after the shooting, later that night at the hospital, and again during a later-recorded statement. Daniel was not, however, able to identify who shot him or his brother, nor could Emmanuel, who saw only the guns amid the chaos. A neighbor in the adjoining duplex, Humberto Adame-Majera, saw no one as he managed to avoid the bullets coming through his walls.

No weapons were ever found, but the police did find physical evidence linking Castro and Garcia to the shooting. That evidence tied back to the 16 shell casings found at the front, back, and side of the brothers' duplex. Those shell casings, described as "7.62 by 39" rounds manufactured by Winchester, are typically known to be fired from an AK-

47 assault rifle. The police found two partial and two empty boxes of the same kind of ammunition during a search of Garcia's home, where Garcia said Castro had also been staying. In the home's furnace closet, the police also found a shoe box containing Castro's identification card, his social security card, a utility bill with Castro's name on it, and various other miscellaneous photos and papers.

The State charged Castro with three felonies as a result of these events: criminal discharge of a weapon at an occupied building causing great bodily harm to Daniel, a severity level 3 felony in violation of K.S.A. 2012 Supp. 21-6308; aggravated battery causing great bodily harm to Emmanuel, a severity level 4 felony in violation of K.S.A. 2012 Supp. 21-5413(b); and criminal possession of a firearm by a convicted felon. Sixteen months later, a jury convicted Castro as charged. Castro challenged the reliability of Daniel's identification of him in his motion for new trial and during his allocution, during which he professed his innocence. The trial court, noting that it was the jury's job to decide credibility, denied the motion for a new trial.

The district court subsequently imposed a presumptive controlling sentence of 206 months' imprisonment. During the same hearing, the district court cited this conviction in support of revocation of Castro's probation in case 10CR680. The court then imposed a controlling 44-month prison sentence, which he ordered to run consecutive to Castro's 206-month prison sentence in 12CR1390.

Castro filed timely appeals in both cases, which this court consolidated for purposes of argument and decision. Castro has not, however, briefed the underlying facts or circumstances of 10CR680. He simply requests that if this court reverses or modifies his convictions in 12CR1390, it "should also vacate the probation revocation in case number 10CR680 and remand for reconsideration in light of that disposition."

4

*Lesser Included Offense of Criminal Discharge of a Weapon*

Castro was charged with and convicted of a severity level 3 person felony of criminal discharge of a weapon at an occupied building causing great bodily harm. He now argues that he should get a new trial because the district court should have *sua sponte* instructed the jury on the lesser offense of criminal discharge of a weapon resulting in bodily harm, a severity level 5 person felony. This instruction was not requested at trial, and the State maintains that such instruction was not factually appropriate.

*Standard of Review*

This court's review of allegations of instructional error includes several steps with corresponding standards of review. Our Supreme Court has recently discussed and reaffirmed those steps and standards in *State v. Barber*, 302 Kan. 367, 376-77, 353 P.3d 1108 (2015):

> "When analyzing jury instruction issues, we (1) determine whether the issue can be reviewed, (2) determine whether any error occurred, and (3) finally determine whether any error requires reversal. [Citations omitted.]
>
> "The first and third steps are interrelated in that whether a party has preserved an issue for review will have an impact on the standard by which we determine whether an error is reversible. [Citation omitted.] If a party preserves a jury instruction issue by raising an appropriate argument before the trial court, there are no reviewability problems:  We will determine whether there was an error and, if so, ask whether it was 'harmless.' [Citations omitted.]
>
> "On the other hand, if, as in this case, a party fails to preserve an objection to the jury instructions by not raising the argument before the trial court, we will still review whether the instruction was legally and factually appropriate but will reverse only for 'clear error.' [Citation omitted.] An instruction is clearly erroneous when '"the reviewing

court is firmly convinced that the jury would have reached a different verdict had the instruction error not occurred."' [Citations omitted.]"

*The Propriety of the Lesser Included Offense Instruction*

A trial court's obligation to instruct on lesser included offenses arises under K.S.A. 2014 Supp. 22-3414(3). That statute directs: "In cases where there is some evidence which would reasonably justify a conviction of some lesser included crime as provided in subsection (b) of K.S.A. 2014 Supp. 21-5109, and amendments thereto, the judge shall instruct the jury as to the crime charged and any such lesser included crime." K.S.A. 2014 Supp. 21-5109(b) further provides: "Upon prosecution for a crime, the defendant may be convicted of either the crime charged or a lesser included crime, but not both." A "lesser included crime" includes "[a] lesser degree of the same crime," K.S.A. 2014 Supp. 21-5109(b)(1); or "a crime where all elements of the lesser crime are identical to some of the elements of the crime charged," K.S.A. 2014 Supp. 21-5109(b)(2).

In this case, Castro was charged with and convicted of criminal discharge of a firearm at an occupied building, which is basically defined in K.S.A. 2012 Supp. 21-6308 (a)(1)(A) as the "[r]eckless and unauthorized discharge of any firearm . . . [a]t a dwelling, building or structure in which there is a human being whether the person discharging the firearm knows or has reason to know that there is a human being present." As charged in this case, the crime is a severity level 3 person felony "if such criminal discharge results in *great bodily harm* to a person in the commission thereof." (Emphasis added.) K.S.A. 2012 Supp. 21-6308(b)(1)(B). The jury was so instructed.

Castro now argues for the first time here that the trial court should have also *sua sponte* instructed the jury regarding a lesser offense of criminal discharge as a severity level 5 person felony, which occurs if the "criminal discharge results in *bodily harm* to a

6

person during the commission thereof." (Emphasis added.) K.S.A. 2012 Supp. 21-6308(b)(1)(C).

The trial court did instruct the jury regarding the distinction between degrees of bodily harm:

> "As used in these instructions 'Bodily Harm' is defined as any touching of the victim against the victim's will, with physical force, in an intentional, hostile and aggravated manner. The word 'Great' distinguishes the bodily harm necessary to prove criminal discharge of a firearm at an occupied dwelling resulting in great bodily harm or aggravated battery from slight, trivial, minor or moderate harm, and as such it does not include mere bruises, which are likely to be sustained in simple battery."

This distinction was in accordance with *State v. Kelly,* 262 Kan. 755, Syl. ¶ 2, 942 P.2d 579 (1997).

*Legal propriety:* We first conduct an unlimited review to determine whether a lesser included instruction was legally appropriate. See *State v. Armstrong,* 299 Kan. 405, 432, 324 P.3d 1052 (2014).

In this instance, the distinguishing element is the result of the defendant's action: bodily harm or great bodily harm. Since in order to have *great* bodily harm it is also necessary to have bodily harm, all of the elements of the severity level 5 offense are identical to some of the elements of the level 3 offense. Thus, an instruction regarding the severity level 5 offense was legally appropriate.

*Factual propriety*: The next step of the inquiry requires this court to "'determine whether there was sufficient evidence, viewed in the light most favorable to the defendant . . . , that would have supported the [lesser included offense] instruction.'" *State v. Jefferson*, 297 Kan. 1151, 1170, 310 P.3d 331 (2013) (quoting *State v. Plummer*, 295

Kan. 156, Syl. ¶ 1, 283 P.3d 202 [2012], and citing *State v. Ward*, 292 Kan. 541, 256 P.3d 801 [2011], *cert. denied* 132 S. Ct. 1594 [2012].) As our Supreme Court recently noted:

> """For a lesser included offense to be factually appropriate, there must be actual evidence in the record, together with reasonable inferences to be drawn from that actual evidence, that would reasonably support a conviction for the lesser included crime."' [Citation omitted.]" *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015).

The parties here disagree on the factual propriety of an instruction on severity level 5 criminal discharge.

Castro does not discuss the actual facts of his case in this context. Rather, he summarily contends the lesser included instruction was factually appropriate because "[a]s a matter of law, if evidence supported a conviction for criminal discharge of a firearm at an occupied dwelling resulting in great bodily harm, it would also support a conviction for criminal discharge of a firearm resulting in simple bodily harm." Castro cites no authority in support of this contention. While this argument might support a conclusion that the instruction was legally appropriate, it fails to take into account the actual facts as necessary under this step of the inquiry.

The jury was instructed that the parties had stipulated that Daniel's injury consisted of "[a] through and through gunshot wound to the left thigh causing the following injuries[:] . . . [A] bullet entrance wound to the left thing [*sic*] . . . [and a] bullet exit wound to the left thigh." The State acknowledges that our Supreme Court has held that a through and through bullet wound is not great bodily harm as a matter of law. *State v. Brice,* 276 Kan. 758, 774, 80 P.3d 1113 (2003). But *Brice* left open the possibility that the trial court "could determine that a bullet wound, even one that missed bone, major

8

arteries, veins and nerves, is not slight, trivial, moderate or minor." 276 Kan. at 774. In such a case, the lesser included offense instruction would be factually inappropriate.

Here, the trial court admitted photographic evidence of Daniel's leg wound which is unfortunately not in the record on appeal. But the record is sufficient to establish that the evidence showed a bloody wound which even Castro characterized as "gruesome." The trial court described the wound in detail and found it probative of the State's burden to prove great bodily harm.

However, our Supreme Court has since determined that the proper practice where there is even the slightest doubt about the extent of bodily harm suffered by the victim is to submit that fact question to the jury. *State v. Williams,* 295 Kan. 506, 523, 286 P.3d 195 (2012). Discussing the facts before it, the Court in *Williams* reasoned that in light of the victim's mixed signals about the extent of her injuries after being stabbed in the head with a steak knife, "[a] reasonable and rational jury could have gone either way: bodily harm in a manner that could have caused great bodily harm [severity level 7 aggravated battery], or great bodily harm [severity level 4 aggravated battery]." 295 Kan. 523.

*No Clear Error*:  Even if the trial court here did not employ the practice suggested in *Williams,* we must still determine if it was "clear error" for the court not to have given *sua sponte* an unrequested lesser included offense instruction. *Barber,* 302 Kan. at 376-77; see also *State v. Dominguez,* 299 Kan. 567, 589, 328 P.3d 1094 (2014).

Castro essentially argues that any error in failing to instruct on a lesser included offense is structural error because it violates a criminal defendant's "inviolate" due process right to a jury trial guaranteed by § 5 of the Kansas Constitution Bill of Rights.

Castro has not explained why this court should consider this constitutional issue for the first time on appeal as required by Kansas Supreme Court Rule 6.02(a)(5) (2015

9

Kan. Ct. R. Annot. 41). In *State v. Williams*, 298 Kan. 1075, 1085-86, 319 P.3d 528 (2014), our Supreme Court warned future litigants that the failure to strictly comply with Rule 6.02(a)(5) would risk the issue being deemed waived or abandoned on appeal. More recently, our Supreme Court held: "We are now sufficiently post-*Williams* that litigants have no excuse for noncompliance with Rule 6.02(a)(5)." *State v. Godfrey*, 301 Kan. 1041, 1044, 350 P.3d 1068 (2015). In accordance with these Supreme Court directives, we hold that Castro has waived or abandoned this constitutional issue raised for the first time on appeal. See *State v. Ferenz*, No. 111,156, 2015 WL 967582, at *17-18 (Kan. App. 2015) (unpublished opinion) (rejecting same argument as that raised here by Castro in part because defendant failed to comply with Rule 6.02[a][5]), *petition for rev. filed* March 27, 2015.

Castro also suggests the more stringent constitutional harmless error analysis applies in determining whether a new trial is required based on the trial court's failure to give a lesser included offense instruction because it deprived him of his right to present a defense under the federal constitution. As Castro acknowledges, however, our Supreme Court recently held the less stringent, nonconstitutional harmless error test applies because the obligation to instruct on lesser included offenses arises under a statute, not the constitution. *State v. Salary*, 301 Kan. 586, 599, 343 P.3d 1165 (2015).

This court will find an instructional error clearly erroneous only if it is "'"firmly convinced that the jury would have reached a different verdict had the instruction error not occurred."' [Citations omitted.]" *Barber*, 302 Kan. at 377. To resolve this question, we should look to our Supreme Court's decision in *Williams* wherein our Supreme Court found clear error was not shown under similar circumstances, reasoning in support:

> "[J]ust because we find that a rational jury *could* have found Williams guilty of the lesser included offense does not necessarily mean that we believe that the jury *would* have convicted her of the lesser offense. Here, the evidence is such that we simply cannot be

firmly convinced of which crime the jury might have chosen, as between the severity level 4 and severity level 7 versions. That degree of certainty, or perhaps more accurately, that degree of uncertainty falls short of what is required to meet the clearly erroneous standard." 295 Kan. at 523-24.

Likewise, in Castro's case, the "degree of certainty, or perhaps more accurately, [the] degree of uncertainty" about which severity level of criminal discharge of a weapon at an occupied building the jury might have chosen based on the evidence of Daniel's leg wound discussed above, "falls short of what is required to meet the clearly erroneous standard." 295 Kan. at 524.

Accordingly, we affirm Castro's conviction of severity level 3 criminal discharge of a weapon.

*Lesser Included Offense of Aggravated Battery*

Castro's second issue on appeal alleges that the trial court erred in failing to *sua sponte* instruct the jury on all lesser included offenses of aggravated battery. However, Castro limits his actual argument to the lesser included offense of reckless aggravated battery. We hold that the failure to adequately brief the propriety of instructions on any other lesser included offenses results in the abandonment of those issues. See *State v. Boleyn,* 297 Kan. 610, 633, 303 P.3d 680 (2013).

*Standard of Review*

We apply the same multistep analysis which we set forth above in discussing Castro's first issue.

11

*The Propriety of the Lesser Included Offense Instruction*

The State charged, and the trial court instructed the jury with regard to, knowing aggravated battery, as defined in K.S.A. 2012 Supp. 21-5413(b)(1)(A) as "[k]nowingly causing great bodily harm to another person." This is a severity level 4 person felony pursuant to K.S.A. 2012 Supp. 21-5413(g)(2)(A). The trial court also instructed the jury that "[a] defendant acts knowingly when the defendant is aware of the nature of his conduct that the State complains about." See PIK Crim. 4th 52.010 (2012 Supp.); K.S.A. 2012 Supp. 21-5202(i).

Castro contends that the trial court should also have instructed the jury on reckless aggravated battery, as defined in K.S.A. 2012 Supp. 21-5413(b)(2)(A) as "recklessly causing great bodily harm to another person." This is a severity level 5 person felony under K.S.A. 2012 Supp. 21-5413(g)(2)(C). "A person acts 'recklessly' or is 'reckless,' when such person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." K.S.A. 2012 Supp. 21-5202(j); see PIK Crim. 4th 52.010 (2012 Supp.).

*Legal Propriety*:  In *State v. McCarley*, 287 Kan. 167, 177-78, 195 P.3d 230 (2008), our Supreme Court held that severity level 5 reckless aggravated battery is a lesser included offense of severity level 4 intentional aggravated battery because it is a "'lesser degree[] of the same crime.'" In support, the *McCarley* court reasoned:

> "[T]he legislature's intent is clear from the words it used. Defining various types of aggravated battery [in K.S.A. 21-3414(b)], *i.e.*, 'aggravated battery as described in' separate subsections, together with allocating different degrees of punishment for each type, establishes that level 5 and level 8 aggravated battery are lesser included offenses of level 4 aggravated battery, *i.e.*, they are 'lesser degrees of the same crime.'" 287 Kan. at 178.

12

Our Criminal Code has been revised since *McCarley* was decided, but the decision remains good law. K.S.A. 2012 Supp. 21-5413(g)(2), which replaced K.S.A. 21-3414(b), continues to distinguish in the same manner between the varying severity levels of the offense of aggravated battery.

Accordingly, we hold an instruction on the lesser included offense would have been legally appropriate.

*Factual Propriety*: Castro would suggest that based on the "chaotic nature of the events" the evidence could have supported a reasonable doubt that Castro was acting knowingly with regard to Emmanuel's injuries. This argument seems to ignore the essentially uncontroverted evidence that any "chaotic" events were fomented by Castro and Garcia arriving at the Valadez home and by their commencement of firing weapons. Castro does not deny that Emmanuel was ultimately shot multiple times at close range by a person holding a long firearm. Such an event would seem to defy description as merely firing a gun toward or near a person in reckless disregard of the risk; such course of conduct would, rather, represent an epitome of knowing and purposeful conduct.

The mental state of Castro is even more clearly established by the evidence of the course of conduct showing that shots were first fired through the front door; that the shooters then broke in and chased the victims through and out of the house while firing at them; that they returned to the duplex; and that, when Emmanuel returned, they repeatedly shot him in the chest and abdomen with an assault rifle from less than 10 feet away. There would be no actual evidence in the record that together with reasonable inferences to be drawn therefrom would reasonably support a conviction for reckless aggravated battery.

In *State v. Henson*, 287 Kan. 574, 587-89, 197 P.3d 456 (2008), our Supreme Court found no error when the trial court refused to instruct the jury on second-degree

13

reckless murder because the evidence excluded such a verdict where the defendant approached the victim, pointed a gun, and shot him in the back of the head. The similar conduct in the instant case—the defendants approaching the victims, the initial shooting, the break in and pursuit, and the ultimate shooting of Emmanuel—similarly exclude a verdict based on reckless conduct.

The trial court did not err in failing to *sua sponte* give an unrequested instruction regarding a factually inappropriate charge of reckless aggravated battery.

## Sufficient Evidence of Reckless Discharge of a Firearm

In a twist from his prior argument regarding reckless aggravated battery, Castro next argues that the act of firing a weapon into the front door of the Valadez duplex demonstrates only intentional conduct, and, thus, the evidence is insufficient to support his conviction for reckless discharge of a firearm at an occupied building.

### Standard of Review

When the sufficiency of evidence is challenged in a criminal case, we review all the evidence in the light most favorable to the prosecution. The conviction will be upheld if the court is convinced that a rational factfinder could have found the defendant guilty beyond a reasonable doubt based on that evidence. In determining whether there is sufficient evidence to support a conviction, we generally will not assess the weight or credibility of the evidence. *State v. Williams,* 299 Kan. 509, 525, 324 P.3d 1078 (2014).

### Reckless/Intentional Behavior

We have previously cited the definition of "reckless" as set forth in K.S.A. 2012 Supp. 21-5202(j); PIK Crim. 4th 52.010 (2012 Supp.). K.S.A. 2012 Supp. 21-5202(h)

provides that "[a] person acts 'intentionally,' or 'with intent,' with respect to the nature of such person's conduct or to a result of such person's conduct when it is such person's conscious objective or desire to engage in the conduct or cause the result."

Castro contends the evidence showed only intentional behavior with regard to the charge of criminal discharge. His argument primarily relies upon our Supreme Court's discussion of the distinction between reckless and intentional acts in *State v. O'Rear*, 293 Kan. 892, 270 P.3d 1127 (2012). In *O'Rear*, a majority of our Supreme Court reversed the defendant's conviction of reckless aggravated battery, concluding the evidence in that case showed only that the defendant "intended to shoot [the victim] in center mass," meaning "he intended to cause great bodily harm." 293 Kan. at 903. The majority continued by noting that regardless of the defendant's motivation behind, or reasons for shooting the victim, which "may have been born of misperception, . . . the intention remained." 293 Kan. at 903. The majority then reasoned:

> "The mental state of recklessness is incompatible with a mental state where a person acts with knowledge, willfulness, or purposefulness, meaning a person cannot act both intentionally and recklessly with respect to the same act. *State v. Shannon*, 258 Kan. 425, 429, 905 P.2d 649 (1995). Rather, an act is either intended or not intended; it cannot simultaneously be both. Consequently, guilt of one necessarily negates guilt of the other." *O'Rear*, 293 Kan. at 903.

Castro's reliance upon *O'Rear* is misplaced. In *O'Rear*, the Supreme Court was dealing with the aggravated battery statutes, and the legislature had specifically included references to both "knowing," *i.e.*, "intentional" conduct, and to "reckless" conduct. Significantly, the legislature did not include any reference to knowing or intentional conduct when defining criminal discharge of a weapon under K.S.A. 2012 Supp. 21-6308(a).

The State correctly notes that *O'Rear* is also factually distinguishable and points out that in this case, unlike in *O'Rear*, the victim of the criminal discharge of the weapon—Daniel—was not visible to the shooter. There was no way for the shooter to have taken aim nor were there any actions by Daniel that Castro might have misinterpreted.

We agree that *O'Rear* does not support Castro's position. The facts demonstrate that the shooter randomly fired numerous shots through the front door and walls of the duplex, knowing the home was occupied, but not knowing where the occupants were located. Such action demonstrates a conscious disregard of a substantial and unjustifiable risk that circumstances exist or that a result will follow—great bodily harm to the unseen occupants—and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation. See K.S.A. 2012 Supp. 21-5202(j).

The evidence is, therefore, sufficient to support the conviction for criminal discharge of a firearm at an occupied building.

*Other Evidentiary Issues*

In his final issue on appeal, Castro contends his convictions must be reversed because there was no reliable identification by an uninterested witness, the physical evidence was not sufficiently connected to him, and there was no forensic evidence. The State suggests that the majority of Castro's arguments are unsupported by proper citations to authority and urges us not to accept Castro's obvious invitation to reweigh the evidence and reassess credibility.

16

*Standard of Review*

The same standard of review which we recited in the previous issue also applies to this challenge to the sufficiency of the evidence.

The only authority cited by Castro in support of his challenge to the sufficiency of the evidence is *State v. Matlock*, 233 Kan. 1, 660 P.2d 945 (1983). In *Matlock*, the court overturned a rape conviction for lack of sufficient evidence. In support, the court concluded the victim's credibility regarding her uncorroborated claim that her stepfather had raped her was so severely undermined and contradicted by the surrounding circumstances—including the physical evidence, the victim's delayed reporting of the rape, and her admission to her propensity to lie—that it was insufficient to sustain the defendant's conviction. 233 Kan. at 4-6.

Castro contends that in his case, the lack of reliable identification evidence by an uninterested witness and lack of both physical and forensic evidence connecting him to the crime requires this court to similarly conclude that no rational finder of fact could have found him guilty beyond a reasonable doubt of each crime charged.

*Identification*

Castro contends that his conviction cannot stand due to the lack of reliable identification by an uninterested witness. In addition to citing no credible authority for this position, Castro essentially invites us to reweigh the evidence and to determine Daniel's credibility, neither of which are the province of this court. See *State v. Kettler,* 299 Kan. 448, 472, 325 P.3d 1075 (2014).

The jury heard Daniel identify Castro as being present on the porch and as being the man with the bigger gun. The jury also heard the testimony that Daniel saw the two

17

men briefly from his bedroom window. The jury heard the testimony that Daniel had been smoking marijuana at the time. The jury heard testimony that, once the shooting began, neither Daniel nor Emmanuel were sure which specific one of the two men was shooting at them. Daniel was cross-examined by Castro's defense counsel, who also focused on the problems with Daniel's testimony during closing argument. The jury chose to credit Daniel's identification of Castro.

*Physical Evidence*

Castro also argues that the boxes of ammunition and other items of personal property belonging to Castro found in the search of the codefendant's home was insufficient to connect Castro to the crime. However, the jury has the duty of weighing all of the evidence, not just isolated items, and to draw reasonable inferences therefrom. We do not second guess the jury in this regard.

*Forensic Evidence*

Finally, Castro summarily complains that the State failed to "present any forensic evidence placing Mr. Castro at the crime scene." He points out that there was no DNA, fingerprints, ballistics, or gun residue offered into evidence that would place Castro at the Valadez duplex.

Forensic evidence is sometimes used to establish a link between a defendant and a crime or crime scene, but certainly not so routinely as TV dramas such as *CSI* would lead some to believe. Castro cites no authority that *requires* any such forensic evidence to sustain a criminal conviction, and our courts have never so ruled. The presence of forensic evidence or lack thereof simply goes to the weight of the State's overall evidence, which again, the jury and not this court determines.

The evidence was sufficient to support Castro's convictions by a reasonable factfinder.

*Probation Revocation*

Since we have determined that Castro's convictions in case 12CR1390 are affirmed, we need not address his request to vacate and remand the probation revocation in case 10CR680 for any further consideration.

Affirmed.