IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 111,995

STATE OF KANSAS,
*Appellee,*

v.

MAURICE ORLANDO STEWART,
*Appellant.*

SYLLABUS BY THE COURT

1.

Premeditated intentional murder and felony murder are not separate and distinct crimes, notwithstanding their considerable differences. Rather, premeditated murder and felony murder are alternative ways by which a person can commit the singular crime of first-degree murder.

2.

When the State prosecutes a defendant for first-degree murder under the alternate theories of premeditated intentional murder and felony murder, the jury must consider both theories before arriving at a verdict on the charge of first-degree murder. If the jury finds a defendant guilty under either theory of first-degree murder, it does not consider second-degree murder or any other lesser included offense.

3.

A defendant may not invite and lead a district court into making an error and then complain of the error on appeal. The invited error doctrine may preclude a challenge to an instruction when the district court gives a defendant's requested instruction to the jury;

when the defendant agrees on the record to the specific wording of a jury instruction; or when the defendant proposes the district court's response to a jury question.

4.

When presented with competing expert opinion testimony, a district court judge acting as fact-finder has the authority and responsibility to assess witness credibility and to weigh the conflicting evidence in order to reach a decision, even though the ruling may comport with one expert opinion and contradict another expert opinion. In the circumstance where a district court is presented with competing and conflicting expert opinion testimony, an appellate court will accord a great deal of deference to the district court's decision.

5.

It is an abuse of discretion for a district court to adopt a pretrial ruling that disposes of a discretionary determination automatically, without analyzing the factors that would enter into the discretionary decision; *i.e.,* it is an abuse of discretion to refuse to exercise discretion or to fail to appreciate the existence of the discretion to be exercised in the first instance.

6.

When faced with a cumulative error claim, an appellate court conducts an unlimited review of the entire record to determine whether the totality of the circumstances establishes that the cumulative effect of trial errors substantially prejudiced the defendant and denied the defendant a fair trial.

Appeal from Johnson District Court; THOMAS KELLY RYAN, judge. Opinion filed April 28, 2017. Judgment of the district court is affirmed.

*Korey A. Kaul*, of Kansas Appellate Defender Office, argued the cause and was on the brief for appellant.

*Steven J. Obermeier*, senior deputy district attorney, argued the cause, and *Stephen M. Howe,* district attorney, and *Derek Schmidt,* attorney general, were with him on the brief for appellee.

The opinion of the court was delivered by

JOHNSON, J.: A jury convicted Maurice Orlando Stewart of felony murder, aggravated robbery, burglary, and theft for incidents occurring in a hotel room occupied by Stephen Cook, located in the same facility where Stewart was staying at the time. Stewart was accused of burglarizing Cook's room to steal a laptop computer and later returning to the room to kill Cook while robbing him of his wallet. The district court imposed a controlling sentence of life without the possibility of parole for 20 years plus 102 months.

On direct appeal to this court, Stewart argues that (1) the district court erred in instructing the jury on the State's alternative theories of first-degree murder; (2) the district court failed to properly instruct the jury on the element of force required for aggravated robbery; (3) the district court erred in finding him competent to stand trial; (4) the district court erred in admitting blood spatter evidence over Stewart's objection that it did not conform to the test from *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923); and (5) cumulative error denied him a fair trial. Finding no reversible error, we affirm Stewart's convictions.

FACTUAL AND PROCEDURAL OVERVIEW

The events leading to Stewart's convictions began to unfold on June 27, 2010, when Cook checked into room 221 at the Econo Lodge in Olathe. Cook worked as a

supervisor of a company that was pressure testing a pipe system close by in Kansas City, Missouri. Stewart; his girlfriend, Stephanie Laguna; and her son were staying in room 223, next door to Cook.

The next day, sometime around late morning or early afternoon, Edye Pool visited her ex-boyfriend, Stewart, at room 223 while Laguna was at work. Stewart gave Pool a laptop without attachments or accessories, telling her it was stolen. At approximately 7 p.m., the Olathe Police Department dispatched an officer to investigate a burglary in room 221, where Cook told the officer that, after work, he discovered his laptop missing, although the carrying case and power cord were still in the room. Laguna would relate that Stewart left their room around 10 or 10:30 p.m. that same day, but she would later hear someone running water in the bathroom.

Early the next day, about 1 a.m., Leeana Deherrera answered the front door of the apartment she shared with Tremain Ryan and two sons, less than a mile from the Econo Lodge. Ryan was not home at the time. Stewart stood at the doorway, appearing panicked and out of breath, as if he had been running. Deherrera and Ryan had known Stewart for approximately 12 years. Stewart said that "somebody tried to kill him," and said that he needed to see his brother. Deherrera directed Stewart to the apartment above her but later went up to check on him. She found Stewart in the bathroom cleaning himself and observed that his jeans were "covered in blood" from the mid-thigh to the shins; that he had a cut on his arm; and that he put his bloody clothes in a black trash bag. He would not answer Deherrera's question as to how he cut his arm.

When Ryan returned home around 1:30 a.m., he took photographs while Deherrera helped stitch up and bandage the cut on Stewart's arm. Stewart told Deherrera and Ryan that three men had followed his car from a gas station to the motel and jumped him, with one trying to cut his neck. Deherrera and Ryan had not known Stewart to own a car.

4

Stewart also told Ryan, "I think I may have killed somebody." Stewart showed Ryan the black trash bag containing his bloodied clothes and told Ryan he intended to "burn them." At some point, Stewart mentioned to Ryan that a "gay guy" had come to his aid after the fight with the three men and that he had "stabbed" or "stuck" this man because he had "sexually hit on him." According to Ryan, Stewart had strong opinions against homosexuality.

Stewart borrowed Ryan's car around 3:30 or 4 a.m. to get Laguna and her son from room 223. En route back to Deherrera and Ryan's apartment, Stewart told Laguna he did not go to the hospital for his arm injury because he "did not want to have any involvement with law enforcement." Sometime after 6 a.m., Stewart left the apartment with Pool, Laguna, and her son, taking the black trash bag containing his bloodied clothes with him.

Cook's coworkers became concerned when he did not show up for a 7 a.m. meeting. After repeated failed attempts to reach Cook by phone, Cook's boss went to the Econo Lodge. When Cook's boss and the night manager went up to room 221 and opened the door, they found Cook dead on the floor of the bathroom in a pool of blood.

Crime scene investigators observed a room in disarray and "a substantial amount of blood." The investigators collected swabs from extensive bloodstains throughout Cook's room. Investigators also found multiple footwear impressions in room 221 and leading next door to room 223, where they found bloodstains in the bathroom and recovered some towels and a t-shirt with staining.

Later that day, Deherrera and Ryan contacted the police after watching press coverage of a murder at the Econo Lodge. Based on the information provided by

5

Deherrera and Ryan, detectives began trying to locate Stewart as a potential suspect in the murder of Cook.

That same day, at approximately 10 p.m., a City of Mission police detective conducted a traffic stop of a truck driven by Pool. During a later inventory search of the truck, the detective found a wallet under the driver's seat containing a business card with the name "Stephen Cook." Pool told police that Stewart asked her to hide the wallet. The crime scene investigator who processed the wallet found Cook's California driving license and 23 receipts, 4 of which had bloodstains. Forensic DNA testing on the wallet and receipts identified both Stewart's and Cook's DNA.

Detectives subsequently determined that Stewart boarded a Greyhound bus travelling from Kansas City, Missouri, to Dallas, Texas, on June 30, 2010. Wichita police arrested Stewart at a scheduled stop in Wichita that same day.

Two Olathe police detectives interrogated Stewart in Wichita. Stewart initially denied having been in Cook's room prior to his death, but when confronted with the evidence of the stolen laptop, he admitted to the burglary and theft. As for Cook's death, Stewart asserted that he had acted in self-defense, relating different versions of what happened when he and Cook went to room 221 after Cook had saved Stewart from the attackers outside of the motel.

At first, Stewart told detectives that Cook, who he repeatedly referred to as a "fag," went into the bathroom, came out without a shirt on, propositioned Stewart, and tried to pull at Stewart's pants as he sat on the bed. When Stewart kicked Cook away, Cook brandished a knife and cut Stewart's arm. Stewart then tried to run from the room but tripped and fell. Cook continued toward Stewart, and Stewart kicked Cook's legs. As Cook fell, Stewart grabbed Cook's arm, causing Cook to cut his own neck. Stewart then

6

fled the room. Stewart maintained that he never had the knife in his hand and did not know what happened to the knife or what it looked like. The knife used as the murder weapon was never located.

In rehashing what happened, Stewart added that Cook had crawled after him and their struggle eventually ended up in the bathroom. Later, Stewart changed his story—in the first version, Stewart said that his pants had stayed on when Cook grabbed them, but in a later version Stewart said his pants had come down. Stewart also added the details that Cook had grabbed Stewart's "penis or testicles" in varying places in the room and that Cook exposed himself to Stewart during the attack, then buttoned himself back up and continued to attack him.

When the detectives challenged Stewart's story that he never had the knife and that Cook had cut his own neck, Stewart said that he had the knife once and that he cut Cook only once. Stewart demonstrated himself cutting Cook, but it appeared to the detectives as if Stewart was striking his own arm in the area where he had been stitched. When confronted about the number of injuries to Cook, Stewart changed his story to having cut Cook four or five times. Stewart also described being on the bed in varying positions when Cook allegedly cut Stewart's arm. Stewart's various descriptions of events did not include any struggle or bloodshed having occurred on the west side of the room, where law enforcement collected some of the evidence.

The State charged Stewart in the alternative with first-degree premeditated murder and first-degree felony murder, and with the aggravated robbery of Cook's wallet. The State also charged Stewart with the burglary of Cook's hotel room and the theft of his laptop.

A lengthy procedural history ensued over the next 40 months before Stewart's jury trial commenced in October 2013. Two of the district court's pretrial rulings are germane on appeal.

In June 2011, Stewart filed a motion seeking a *Frye* hearing on the admissibility of DNA evidence and blood spatter evidence, with the goal of excluding testimony from Jeremiah Morris, a blood spatter expert. At an unrelated suppression hearing in August 2011, Judge Stephen R. Tatum ruled that the blood spatter evidence did not trigger a *Frye* analysis because the evidence did not qualify as new or experimental. Judge Tatum clarified that the defense was free to revisit the issue if anything new came up and could raise the issue at trial if necessary to challenge Morris' qualifications or conclusions.

In March 2012, Stewart's attorney filed a motion requesting a competency determination. The district court, relying on a competency evaluation report from the Johnson County Mental Health Center, found Stewart competent to stand trial. The defense subsequently moved to reopen the issue of competency and to commit Stewart to Larned State Hospital. The district court, after considering conflicting expert opinions, sent Stewart to Larned, where doctors found Stewart competent to stand trial after observing and evaluating him for 90 days. At a competency hearing in March 2013, the defense presented evidence from two experts who opined that Stewart was incompetent to stand trial. Three experts for the State testified that they reached the opposite conclusion. The district court, after considering the evidence, found Stewart competent to stand trial.

During the 8-day jury trial, defense counsel informed Judge Thomas Kelly Ryan she intended to renew the pretrial objection to the admission of both DNA and blood spatter evidence to ensure that there was a contemporaneous objection in the record. When defense counsel subsequently objected to the admission of the DNA evidence,

8

Judge Ryan ruled, "I'm not going to make any different ruling from what Judge Tatum had done in the prior hearings. You can bring up the blood spatter when we get to that point."

The DNA analyst testified that Cook's DNA had been identified in numerous bloodstains found in his room 221. Stewart's DNA was identified on a sock found under Cook, in the hallway leading to Stewart's room 223, and in the bathroom in room 223. A forensic scientist testified that several footprint impressions found in Cook's room, including impressions left on Cook's shoulder and buttocks, either could be or were from Stewart's shoes.

Just before the State called Morris to the stand, defense counsel renewed the pretrial objection challenging the scientific reliability of the blood spatter evidence under *Frye*. Judge Ryan clarified that he was unable to locate any written order by Judge Tatum with regard to the blood spatter evidence. Defense counsel informed Judge Ryan there was no written order and that the issue was addressed at a suppression hearing. Judge Ryan explained, "I just wanted to make sure for the record that it is there," and then ruled, "I'm going to abide by what the previous ruling is by Judge Tatum and overrule the objection at this point." Judge Ryan made no additional findings of fact and did not otherwise elaborate on the reasons for his conclusions. Stewart did not request any additional findings from the court.

Defense counsel again objected when the State attempted to introduce Morris' PowerPoint presentation explaining his blood spatter analysis and conclusions. Defense counsel based this renewed objection, which was tantamount to a motion to reconsider, on the same scientific reliability argument that underlay the pretrial objection.

Morris testified that he had spent 3 days at the crime scene conducting a bloodstain pattern analysis to determine where the bloodshed first occurred in room 221 and how it continued into room 223. Morris concluded that the bloodshed from the struggle in room 221 began on the west side of the bed, moving eastward to end in the bathroom. He said the bloodstains were consistent with the victim being on or near the ground while the assailant was in an upright position.

The forensic neuropathologist who performed the autopsy on Cook testified Cook's death was a homicide. Cook died from a combination of profuse bleeding from 24 to 40 superficial sharp-force injuries or knife cuts and his underlying severe heart and lung disease, including advanced emphysema. Cook also had a fracture of the sternum, or breastbone, 11 broken ribs, and 4 defensive wounds on his right palm where he grabbed or attempted to ward off the knife blade. The forensic neuropathologist believed that Cook did not die immediately and might have survived his injuries had he received immediate medical attention.

The defense theory was that Stewart killed Cook in self-defense after Cook attacked and injured Stewart with a knife when Cook's sexual advances were rejected. To corroborate the theory and Stewart's version of events relayed during his interrogation, defense counsel sought to portray Cook as a severe alcoholic who led a promiscuous homosexual lifestyle, soliciting men while he traveled the country and becoming verbally and physically abusive when drinking. Defense counsel characterized Stewart's murderous act as a post-traumatic stress disorder (PTSD) "panic reaction" to Cook's sexual advances and assault.

The jury convicted Stewart of felony murder based on the underlying felony of aggravated robbery; aggravated robbery of Cook's wallet; burglary; and theft of Cook's laptop computer. The court imposed a hard-20 life sentence plus 102 months.

Stewart timely appealed. This court has direct-appeal jurisdiction under K.S.A. 2015 Supp. 22-3601(b)(3) and (4) (off-grid crime; maximum sentence of life imprisonment imposed).

INSTRUCTION ON ALTERNATIVE THEORIES OF FIRST-DEGREE MURDER

Stewart's first alleged instructional error challenges the district court's use of PIK Crim. 3d 56.02-A to instruct the jury on the State's alternative theories of first-degree murder—premeditated murder and felony murder. He argues that Jury Instruction No. 15 was legally inappropriate because it instructed the jury to consider lesser included offenses for both alternative theories, despite felony murder having no lesser included offenses.

*Standard of Review*

For jury instruction issues, appellate courts first consider the reviewability of the issue from both jurisdiction and preservation viewpoints exercising an unlimited standard of review. *State v. Woods*, 301 Kan. 852, 876, 348 P.3d 583 (2015). This court has jurisdiction under K.S.A. 2015 Supp. 22-3601(b)(3) and (4). Because Stewart did not object to the challenged alternative theory instruction, he is constrained on appeal to show that the instruction was clearly erroneous. See K.S.A. 22-3414(3); *State v. Williams*, 295 Kan. 506, 510-11, 286 P.3d 195 (2012).

In determining whether the challenged instruction was clearly erroneous, this court first determines whether the instruction at issue was both legally and factually appropriate. We employ an unlimited review of the entire record to analyze the legal question of whether the instruction fairly and accurately states the applicable law. In considering whether the jury instruction was factually appropriate, we determine whether

11

there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, to support the instruction. If error is present, this court must be firmly convinced, based on a de novo review of the entire record, that the jury would have reached a different verdict without the error. *State v. Dominguez*, 299 Kan. 567, 573-74, 328 P.3d 1094 (2014). Stewart has the burden to prove the degree of prejudice necessary for reversal. See *State v. Betancourt*, 299 Kan. 131, 135, 322 P.3d 353 (2014).

*Analysis*

Although the use of PIK instructions is generally not required, it is strongly recommended, absent a particular need to alter or add to the PIK instructions under the facts of the case at hand. *Dominguez*, 299 Kan. at 576; *State v. Dixon*, 289 Kan. 46, 67, 209 P.3d 675 (2009). Here, the district court followed that recommendation and relied on the pattern instructions and verdict form specifically designed for trials in which the State presents alternative theories of first-degree murder to the jury. See Notes on Use to PIK Crim. 3d 56.02-A. The challenged Jury Instruction No. 15, patterned after PIK Crim. 3d 56.02-A, stated:

> "In this case, the State has charged the defendant with one offense of murder in the first degree and has introduced evidence on two alternate theories of proving the crime.

> "The State may prove murder in the first degree by proving beyond a reasonable doubt that the defendant killed Stephen Cook and that such killing was done while in the commission of aggravated robbery or in the alternative by proving beyond a reasonable doubt that the defendant killed Stephen Cook intentionally and with premeditation, as fully set out in these instructions.

> "Where evidence is presented on the two alternate theories of proving the crime charged, you must consider both in arriving at your verdict.

12

"In instruction 17 the Court has set out for your consideration the essential claims which must be proved by the State before you may find the defendant guilty of felony murder, that is the killing of a person in the commission of aggravated robbery.

"In instruction 16 the Court has set out for your consideration the essential claims which must be proved by the State before you may find the defendant guilty of premeditated murder.

"If you do not have a reasonable doubt from all the evidence that the State has proven murder in the first degree on either or both theories, then you will enter a verdict of guilty.

"If you have a reasonable doubt as to the guilt of the defendant as to the crime of murder in the first degree, then you must consider whether the defendant is guilty of intentional murder in the second degree, unintentional murder in the second degree, voluntary manslaughter or involuntary manslaughter."

For the first time on appeal, Stewart contends that the last paragraph of the instruction was not legally appropriate because the felony murder alternative manner of committing first-degree murder has been retroactively defined as containing no lesser included offenses. K.S.A. 2015 Supp. 21-5402(d) and (e); see also *State v. Todd*, 299 Kan. 263, 274-79, 323 P.3d 829 (2014) (new definition of felony murder applied to all cases not final). In contrast, the premeditated intentional murder alternative component of first-degree murder continues to be defined as encompassing lesser included offenses. Therefore, Stewart argues, the jury should have been instructed to consider the lesser included offenses if it had a reasonable doubt as to Stewart's guilt as to the crime of premeditated murder, rather than if it had a reasonable doubt as to the crime of murder in the first degree.

Stewart points to the verdict form, where the jury did not select premeditated murder. He contends that verdict form indicates the jury had a reasonable doubt as to whether Stewart committed premeditated murder, which would require the jury to proceed to consider the lesser included offenses of premeditated murder, notwithstanding its guilty verdict on felony murder. His argument is founded on the notion that, because felony murder is not a lesser included offense of premeditated murder and has no lesser included offenses of its own, felony murder should not be considered part of the "first degree premeditated murder tree of lesser included offenses." In other words, the jury in this case had to consider the lesser included offenses of premeditated murder, separate and apart from its consideration of the elements of felony murder. We disagree.

As Stewart acknowledges, felony murder is not a lesser included offense of premeditated murder. Likewise, premeditated murder and felony murder are not separate and distinct crimes, notwithstanding their considerable differences. They are alternative ways to commit the singular crime of first-degree murder. See K.S.A. 2015 Supp. 21-5402(d); *State v. Thomas*, 302 Kan. 440, 448, 353 P.3d 1134 (2015); see also *Dominguez*, 299 Kan. at 576 (citing PIK Crim. 3d 56.02, Comment, noting that K.S.A. 21-3401 merely provides alternative methods of proving first-degree murder); *State v. Starr*, 259 Kan. 713, 720, 915 P.2d 72 (1996) ("Premeditated and felony murder are not separate and distinct offenses but are two separate theories under which the crime of first-degree murder may be committed.").

Consequently, the district court appropriately instructed the jury to simultaneously consider both alternative theories of proving the charged crime of first-degree murder. Only if it rejected both alternate theories of first-degree murder did the jury need to move on to consider second-degree murder and other lesser included offenses. Stewart's proposed instruction would have the jury simultaneously considering first- and second-degree murder, which we have held is improper. See *Dominguez*, 299 Kan. 567, ¶ 1

14

("trial court errs by failing to instruct the jury that both theories are separate types of first-degree murder and both theories must be considered before the jury arrives at a verdict regarding the charge of first-degree murder").

In short, the district court did not err in instructing the jury to simultaneously consider premeditated and felony murder, and, upon finding Stewart guilty on either or both theories, to sign the verdict form, ending deliberations without consideration of any lesser included homicide offenses. Without error, the instructions could not be clearly erroneous. See *Williams*, 295 Kan. at 515 (to determine whether an instruction was clearly erroneous, reviewing court necessarily must first determine whether it was erroneous).

INSTRUCTION ON FORCE

For his second alleged instructional error, Stewart contends that the district court failed to instruct the jury that the justified force reflected in the self-defense jury instruction could not satisfy the element of force to find he committed aggravated robbery, the underlying crime for his felony-murder conviction. The State argues that Stewart invited any error by urging the district court to refrain from defining the element of force for aggravated robbery when responding to the jury's question seeking the definition of that element.

*Invited Error*

Because Stewart did not object to the district court's alleged failure to give a jury instruction distinguishing the element of force for self-defense and aggravated robbery, this court, as discussed, would generally review the jury instruction to determine whether it was clearly erroneous. See K.S.A. 22-3414(3); *Williams*, 295 Kan. at 510. However, a

15

defendant's ability to allege an instructional error, even under K.S.A. 22-3414(3), is not absolute.

A defendant may not invite and lead a district court into error and then complain of the error on appeal. *State v. Verser*, 299 Kan. 776, 784, 326 P.3d 1046 (2014). The invited error doctrine precludes a challenge to an instruction as clearly erroneous under K.S.A. 22-3414(3) when the district court gives a defendant's requested instruction to the jury. *State v. Jones*, 295 Kan. 804, 811-12, 286 P.3d 562 (2012). The doctrine can also apply where there has been an on-the-record agreement to the wording of the instruction at trial. *State v. Peppers*, 294 Kan. 377, 393, 276 P.3d 148 (2012). This court has also applied the invited error doctrine in reviewing a district court's response to a jury question. See *State v. Adams*, 292 Kan. 151, 163-65, 254 P.3d 515 (2011).

"Robbery is the taking of property from the person or presence of another *by force* or by threat of bodily harm to any person." (Emphasis added.) K.S.A. 21-3426. The crime of robbery is aggravated under K.S.A. 21-3427 "when the robber is armed with a dangerous weapon or inflicts bodily harm upon any person in the course of the robbery." *State v. Harris*, 297 Kan. 1076, 1082, 306 P.3d 282 (2013).

Here, the district court properly instructed the jury on the following elements of aggravated robbery, modified from PIK Crim. 3d 56.31, based on how the State charged the crime:

> "To establish [aggravated robbery], each of the following claims must be proved:
> "1. That the defendant intentionally took a wallet from the person or presence of Stephen Cook;
> "2. *That the taking was by force*;
> "3. That the defendant was armed with a dangerous weapon; and

16

"4. That this act occurred on or about the 28th day of June, 2010, and the 29th day of June, 2010, in Johnson County, Kansas." (Emphasis added.)

For the first time on appeal, Stewart argues that if the jury believed he used force to defend himself, but later took the wallet, he would have committed a theft, not robbery. In other words, the jury could not use any justified self-defense force to meet the requisite "force" element of robbery. He contends that the district court should have, *sua sponte*, instructed the jury about that distinction and that a question from the jury demonstrates that the absence of such an instruction would have changed the outcome.

During deliberations, the jury posed the following question: "What's the definition of the use of force in taking the wallet?" When the court sought input from the parties, defense counsel, with Stewart present, stated:

"I think the best thing to do is just to have the jury refer back to the jury instructions. They've already been instructed on the law. We've agreed what the instructions should be and to not give a further definition of force. *Everything that we wanted to have in there is in that jury instruction packet*." (Emphasis added.)

Defense counsel further clarified, "Our request would be to just give them the generic, we must refer . . . to the instructions. My experience has been that typically it's the instructions as a whole and leave it at that, rather than a specific instruction." When asked if there was any objection to the district court's suggested response, "I must refer you back to the jury instructions for any definition of the use of force in taking the wallet," defense counsel replied, "No." A written document in the record on appeal, signed by the trial judge, reflects the identical response.

As Stewart points out in his brief, his underlying premise—that self-defense force is not proof of the taking-by-force element of robbery—is not settled law in this state. To

17

the contrary, the Court of Appeals has held that "self-defense does not justify the taking of money or property from an aggressor, and the lawfulness of the force used to accomplish the theft is immaterial." *State v. Antwine*, 4 Kan. App. 2d 389, 400, 607 P.2d 519 (1980). Nevertheless, we need not consider that question further in this case.

Stewart had the opportunity to seek to dispel any purported confusion about force in response to the jury's question. The response to the jury explaining what constituted force for aggravated robbery could also have explained what did not constitute force. Instead, defense counsel invited the district court not to provide the jury with any further definition of what satisfied the element of force for the crime of aggravated robbery, "[t]he key question for this issue" on appeal according to Stewart. More importantly, defense counsel explicitly told the district court, "Everything that we wanted to have in there is in that jury instruction packet."

In short, if there was any instructional error, the defense's unequivocal affirmative assertion that the instruction packet contained all the instructions Stewart wanted precludes this first-time-on-appeal argument that the jury instructions were clearly erroneous under K.S.A. 22-3414(3). See *Peppers*, 294 Kan. at 393 (when a defendant has invited error, he or she cannot complain of the error on appeal).

COMPETENCY TO STAND TRIAL

Stewart argues that the district court should have found him incompetent to stand trial based on the evidence of his low intelligence quotient (IQ) with corresponding impaired cognitive function. The State responds that substantial competent evidence supports the district court's ruling of competency and that this court should not reweigh the evidence or assess the credibility of the parties' respective experts.

18

*Standard of Review*

An appellate court applies an abuse of discretion standard when reviewing a district court's decision that a defendant is competent to stand trial. *Woods*, 301 Kan. at 860. A judicial action constitutes an abuse of discretion if the action is (1) arbitrary, fanciful, or unreasonable, (2) based on an error of law; or (3) based on an error of fact. 301 Kan. at 861.

Stewart does not argue an error of fact or law. Accordingly, ""[i]f reasonable persons could differ as to the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion." [Citations omitted.]'" *State v. Hill*, 290 Kan. 339, 367, 228 P.3d 1027 (2010). Stewart bears the burden of showing such abuse of discretion. See *State v. Rojas-Marceleno*, 295 Kan. 525, 531, 285 P.3d 361 (2012).

*Analysis*

"The criminal trial of an incompetent person violates due process. *Medina v. California*, 505 U.S. 437, 453, 112 S. Ct. 2572, 120 L. Ed. 2d 353 (1992)" *Woods*, 301 Kan. at 857. A defendant is incompetent to stand trial when he or she is charged with a crime and, because of mental illness or defect, is (1) unable to understand the nature and purpose of the proceedings or (2) cannot make or assist in making his or her defense. K.S.A. 22-3301(1). This standard is in accord with *Dusky v. United States*, 362 U.S. 402, 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960), which held that a criminal defendant may not stand trial unless he or she has sufficient present ability to consult with his or her lawyer with a reasonable degree of rational understanding and a rational as well as factual understanding of the proceedings against him or her. See *State v. Barnes*, 293 Kan. 240, 256, 262 P.3d 297 (2011).

A defendant is presumed competent to stand trial. *Woods*, 301 Kan. at 860. However, the defendant, defendant's counsel, the prosecutor, or the judge *sua sponte* may raise the issue of a defendant's competency to stand trial any time between the filing of the charging document and before pronouncement of sentence. If the judge has reason to believe that the defendant is incompetent to stand trial, the proceedings are suspended and a competency hearing must be held. K.S.A. 22-3302(1). The party who raises the issue of a defendant's competency to stand trial has the burden of going forward with the evidence. The district court measures the evidence presented by a preponderance of the evidence standard. *Barnes*, 293 Kan. at 256. Generally, a preponderance of the evidence means ""evidence which shows a fact is more probably true than not true."" *State v. Barlow*, 303 Kan. 804, 810, 368 P.3d 331 (2016) (quoting *In re B.D.-Y.*, 286 Kan. 686, 691, 187 P.3d 594 [2008]).

A defendant may raise both procedural and substantive competency claims on appeal. A procedural competency claim falls under K.S.A. 22-3302 and is generally based upon the district court's alleged failure to hold a competency hearing or its failure to hold an adequate competency hearing. A substantive competency claim alleges the defendant was tried and convicted while, in fact, incompetent. *Woods*, 301 Kan. at 858. Here, Stewart makes a substantive competency claim, arguing he was in fact incompetent to stand trial so that the district court erred when it concluded otherwise.

The defense first raised the question of Stewart's competency in a June 2011 motion seeking to suppress statements Stewart made to detectives during the interrogation in Wichita. The defense hired Dr. Kathie Nichols, a clinical psychologist, to assess whether Stewart had knowingly and voluntarily waived his rights under *Miranda v. Arizona*, 384 U.S. 436, 473-74, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

At a November 2011 suppression hearing, Nichols testified that she administered the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV) to measure Stewart's cognitive ability. According to Nichols, Stewart's index score of 70 on the WAIS-IV subscale measuring verbal comprehension fell within the borderline intellectual functioning range between low average and mental retardation. Taking into account the remaining index scores of the WAIS-IV, Nichols determined that Stewart had a full-scale IQ of 75, placing him on the borderline of cognitive function or in the bottom 5 percent among his peers. Nichols also found that Stewart met the criteria for PTSD. Nichols concluded that Stewart could not have knowingly and intelligently waived his *Miranda* rights nor adequately asserted his right to an attorney.

The State referred Stewart to Dr. Mitchell Flesher, a clinical psychologist. Flesher administered two subtests of the Wechsler Individual Achievement Test, Second Edition (WAIT-II) and found that Stewart had a second grade reading comprehension level and a listening comprehension corresponding to a fourth grade level. Flesher agreed with Nichols' scoring of Stewart's borderline IQ. The January 2012 psychological evaluation report included an Axis I diagnosis of PTSD and Learning Disorder, Not Otherwise Specified (Verbal), and an Axis II diagnosis for Antisocial Personality Disorder. Flesher, however, concluded that the evaluations conducted by him and Nichols did not support a finding that Stewart suffered from a "mental condition" at the time of the interview in police custody preventing him from knowingly waiving his *Miranda* rights.

In March 2012, the defense filed a motion under K.S.A. 22-3302(1) requesting a determination of Stewart's competency to stand trial. The district court ordered an evaluation to assess Stewart's competency to stand trial and to make or assist in his defense.

Mark Rychlec, a clinical psychologist, interviewed and observed Stewart for approximately 50 minutes and performed some limited testing (Flostein Mini-Mental Status Exam) indicating that Stewart had a "moderate cognitive impairment," which Rychlec believed was "most likely" attributable to a "lower intellectual function as opposed to neurological impairment." Rychlec concluded that Stewart was competent to stand trial and did not display "severe cognitive impairment" preventing him from assisting in his defense. Rychlec's competency evaluation report included the caveat, "[E]ducation on legal terminology and rehearsals be utilized to assure [Stewart] understands the material being discussed in the courtroom." Relying on Rychlec's report, the district court found Stewart competent to stand trial.

In June 2012, the district court granted a request from new attorneys for Stewart for additional testing by Nichols to aid in Stewart's defense. That same month, the district court held the continued suppression hearing on the question of whether Stewart had knowingly and voluntarily waived his *Miranda* rights. Nichols and Flesher offered competing testimony as to whether Stewart had such an ability.

In September 2012, the defense moved to reopen the issue of competency and to commit Stewart to Larned for further testing under K.S.A. 22-3303. The defense expressed concern with Stewart's ability to assist in his defense and asserted that Nichols disagreed with Rychlec's conclusions and would testify Stewart was incompetent to stand trial.

The district court held a hearing to address Stewart's supplemental motion to determine competency to stand trial. The defense presented Nichols, who testified that, given her overall diagnoses of Stewart, she did not believe Stewart could understand the nature of the proceedings against him or aid in his defense. After noting the conflicting expert opinions of Rychlec and Nichols, the district court ordered Dr. Bascom Ratliff, a

22

social worker for Associates at Hope Harbor, to conduct an independent competency evaluation of Stewart.

Ratliff interviewed Stewart on at least two occasions and performed verbal and cognitive testing. Ratliff concluded that Stewart was not competent to stand trial because Stewart did not understand courtroom procedures due to the cognitive impairment from a borderline IQ of 75; Stewart's knowledge was limited in assisting with his defense; and Stewart had been diagnosed with, and suffered from, PTSD.

In October 2012, the district court found Stewart incompetent to stand trial under K.S.A. 22-3302. The district court ordered Stewart committed to Larned for evaluation and treatment pursuant to K.S.A. 22-3303(1) for a period not to exceed 90 days and ordered that the hospital staff submit a written report as to their findings and conclusions within that 90-day period. The district court filed a subsequent order of committal under K.S.A. 22-3303(1), directing Stewart to submit to a mental examination under K.S.A. 22-3219(1) to see if he lacked the mental state required as an element of the alleged offenses.

Larned held Stewart for 90 days for observation and evaluation. At the conclusion of the evaluation, the Larned team filed a forensic evaluation report with the district court on January 30, 2013. The Larned report, authored by psychologist Dr. Renee Clarke, concluded that Stewart was competent to stand trial and that he did not lack the requisite mental state at the time of the alleged offenses.

The Larned report indicated Clarke administered the Mini-Mental State Examination-Second Edition (MMSE-2) to assess Stewart's current cognitive state and the Wide Range Achievement Test-Fourth Edition (WRAT-4) to assess his basic academic and literacy skills. The report noted that Stewart's scores for both the MMSE-2 and WRAT-4 might have been "depressed" or "impacted" due to a lack of effort. Clarke

23

administered the following battery of tests to determine whether there was evidence of Stewart malingering: Structured Interview of Reported Symptoms-Second Edition (SIRS-2), Test of Memory Malingering (TOMM), and Structured Inventory of Malingered Symptomatology (SIMS). Stewart's responses for the SIRS-2 indicated he had an increased likelihood of feigning his symptoms and required further evaluation. Stewart's subsequent scores for the TOMM "rarely" occurred from honest responders with cognitive impairments and were "common for someone who is intentionally trying to do poorly" and "suggestive of malingering." His total score for the SIMS was "significantly elevated above" the recommended cutoff score for suspected malingering.

Clarke also tested Stewart for competency, using the Evaluation of Competency to Stand Trial-Revised (ECST-R). The Larned report stated that several scales of the ECST-R "revealed some evidence of feigned incompetency and possible over reporting" and that the "severe" rating of impairment Stewart received for the Factual Understanding of the Proceedings scale of the ECST-R was questionable given Stewart's effort in responding to questions.

The Larned report included Axis I diagnoses of adjustment disorder with depressed mood, polysubstance dependence, physiological dependence (in a controlled environment), and malingering. The report also indicated an Axis II diagnosis for antisocial personality disorder. In discussing the Axis I diagnosis of malingering and its impact on assessing Stewart, the report summarized,

> "Mr. Stewart also meets the criteria for Malingering. He is intentionally producing false or grossly exaggerated physical or psychological symptoms, motivated by external intensives such as evading criminal prosecution. Malingering should be strongly suspected if any combination of the following is noted[:] any sort of mediolegal [*sic*] context in their presentation, any marked discrepancy between people's claimed stress or disability and objective findings, and if a person lacked cooperation during

24

diagnostic evaluation, and the presentation of Antisocial Personality Disorder. Mr. Stewart meets all of these criteria. . . . Mr. Stewart has been diagnosed with Antisocial Personality Disorder and on some of the psychological testing [*sic*] the TOMM, SIMS, and SIR-2 [*sic*] it showed Mr. Stewart was malingering.

"Mr. Stewart has also previously been diagnosed with Borderline Intellectual Functioning with an IQ of 75 on one of his previous competency evaluations. However, [due] to his malingering and lack of effort it is difficult to assess if Mr. Stewart really does suffer borderline intellectual functioning. Therefore, it is not diagnosed at this time."

As to the issue of Stewart's competence, the Larned report indicated Stewart was not exhibiting symptoms during the current evaluation "that significantly impact his understanding of his current legal circumstances or his ability to assist counsel." The report also clarified that, despite Stewart's claims at Larned of not knowing information related to competency, he had demonstrated factual knowledge during two previous competency evaluations. The report attributed Stewart's claims to his malingering, noting that Stewart "did not appear to be putting forth his best effort throughout his competency evaluation, responding I don't know to almost every question." The report recommended that if Stewart continues to present himself as incompetent to stand trial it should be "regarded as voluntary and not due to any psychiatric issues." The report concluded that, "taking into consideration all of the available data, Mr. Stewart fulfills the criteria to be considered competent to stand trial."

At the March 2013 competency hearing, the defense presented the testimony of Ratliff. Nichols did not testify. The district court admitted the affidavit and report Nichols prepared in support of Stewart's September 2012 motion, asking that he be committed to Larned; neither is in the record on appeal. Flesher, Rychlec, and Clarke testified for the State.

25

Ratliff testified that he tested Stewart's cognitive level and determined that Stewart was "borderline functioning and that he was not competent." Ratliff attributed his conclusion to Stewart's restricted vocabulary, difficulty with being distracted, and inability to understand certain questions and words. Ratliff disagreed with the malingering diagnosis from Larned, instead attributing the Larned results to Stewart's PTSD, or survival instincts from being in a different environment, and Stewart's lower intellectual functioning. Ratliff opined that Larned's failure to test Stewart for PTSD and his intellectual functioning made the malingering diagnosis "less valid."

Flesher acknowledged that he did not examine Stewart to test for competency. Flesher, however, testified that based on his observations during the approximately 3 hour interview, in which Stewart's counsel was present for about an hour, there was no indication Stewart was unable to assist in his defense. He appeared to understand the role of an attorney, and he could communicate with his attorney.

Rychlec testified that despite Stewart's moderate cognitive impairment, which he attributed to lower intellectual functioning, Stewart understood the different roles in the courtroom and was capable of assisting his attorney with his defense and understood the process with "a degree of coaching and education on legal terminology."

Clarke testified that Stewart was placed in the group at Larned designed to restore competency and teach information needed for lower functioning individuals to be competent to stand trial. Larned did not mandate participation in the group—Stewart chose to attend 4 of the 10 group lessons and 3 of the 4 individual lessons. Clarke noted that when Stewart did attend the group sessions he would sit with his head on the table or sleep, "but he never participated." Clarke stated that she felt it necessary to test Stewart for malingering given his level of effort and that the subsequent testing indicated Stewart was feigning a mental disorder and malingering. Clarke testified she did not diagnose

26

Stewart with PTSD because she did not observe those symptoms during the 3-month observation period, and that because of Stewart's malingering and lack of effort she was unwilling to evaluate his intellectual functioning. Clarke opined that Stewart was competent to stand trial and that if Stewart was unable to assist in his defense it would be "due to his choice."

In April 2013, the district court heard arguments before taking the matter of competency under advisement. In argument, defense counsel pointed out that despite the competency concerns that prompted Stewart being sent to Larned, *i.e.*, PTSD and low intellectual functioning, Larned focused only on whether Stewart was malingering. Defense counsel asserted that the district court should disregard the Larned report because Ratliff correctly concluded, that had Larned tested for PTSD and low intellectual functioning, the results might have explained any concerns about Stewart malingering. The State argued the evidence clearly supported that Stewart was malingering and, irrespective of any concern espoused by Ratliff regarding Stewart having "difficulty" understanding, the proper standard was whether he was "unable" to understand the proceedings.

The next month, the district court announced its ruling from the bench. In summarizing the evaluations by the various experts, the district court quoted from the portion of Rychlec's report discussing the competency interview with Stewart and his observations:

> "'Mr. Stewart understands the nature and purpose of the proceedings against him. He correctly identified the major participants in the courtrooms and their respective functions. He stated that he fired his attorney, Angela Keck, which indicated he's aware that the defense attorney works with him to make a legal defense.

"'Mr. Stewart understands the roles of [the] prosecuting attorney and the Judge that presides over the case. His responses were unsophisticated, but he understands the difference between a verdict of guilty and not guilty. There are some terms he indicated he did not understand: Plea Bargain, cross-examine, attorney-client privilege. This appears to be as a result of Mr. Stewart's lower academic achievement and not the result of a psychiatric condition. Finally, Mr. Stewart is aware of the importance of displaying appropriate courtroom behavior.'"

The district court found that Stewart did not have a significant psychiatric impairment and that Stewart's borderline IQ did not render him incompetent to stand trial. The district court stated, "There's nothing presented here from all the evaluations . . . that keeps Mr. Stewart from being able to participate in his own defense and to understand what he's charged with. . . . The Court thinks he is competent to stand trial." The district court opined that Rychlec "got it right." Pointing to Rychlec's competency interview with Stewart, the district court noted that during the interview "Stewart was able to respond to those questions and make his views felt and the fact that he felt he was relying on self-defense throughout and that position he held throughout that long interview." The district court subsequently denied Stewart's June 2011 suppression motion.

Stewart complains that no reasonable judge "would give more weight" to the opinion of the State's expert from Larned that Stewart was competent to stand trial, when his own expert witnesses established that Stewart's cognitive level interfered with his competence to stand trial. But our trial judges are frequently presented with competing expert opinion testimony, requiring the jurists to assess the credibility of the witnesses and weigh the conflicting evidence to reach a decision that comports with one opinion and contradicts the other opinion. We endow our district courts with the authority and responsibility to make that choice, *i.e.*, to trust one opinion over another. See *Hill*, 290 Kan. at 370-71 (to extent trial judge trusted opinions originating from Larned team more than those from defense, "he was entitled to do so"). Moreover, we defer to the district

court's decision when it is presented with conflicting evidence on competency. See *State v. Barnes*, 263 Kan. 249, 263, 948 P.2d 627 (1997).

Without doubt, Stewart has some level of cognitive impairment because of his low IQ. But we have never declared that a defendant's low IQ, standing alone, renders a person incompetent to stand trial. *Cf. Atkins v. Virginia*, 536 U.S. 304, 318, 122 S. Ct. 2242, 153 L. Ed. 2d 335 (2002) ("Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial."). Competency to stand trial addresses the defendant's ability to understand the charges and proceedings and/or assist his or her counsel in defending against those charges. See *Barnes*, 293 Kan. at 256.

While both defense experts, Nichols and Ratliff, opined that Stewart was incompetent to stand trial, the State's experts—Flesher, Rychlec, and Clarke—had the opposite opinion. Flesher testified that Stewart understood the role of an attorney and could communicate with his attorney and assist in his defense. Rychlec concluded that, despite Stewart's cognitive impairment, he understood the nature of the proceedings and different roles in the courtroom and was capable of assisting with his defense. Clarke found that Stewart did not exhibit any symptoms that impacted his competency to understand his current legal circumstances or ability to assist his defense, unless he made the choice not to do so, *i.e.*, unless he was malingering.

Stewart's attempt to pick apart the opinions of the State's experts is simply unavailing. While Stewart's low IQ score certainly placed his competency to stand trial in issue, a preponderance of the evidence supported the district court's determination that he was competent to stand trial. See *Barnes*, 293 Kan. at 256. The district court acted well within its discretion when it relied on the opinions of the State's experts, after carefully weighing the conflicting evidence. It cannot be said that no reasonable person would

agree with the district court. See *Hill*, 290 Kan. at 366-67. Accordingly, the district court's finding that Stewart was competent to stand trial is affirmed.

BLOOD SPATTER EVIDENCE

Next, Stewart challenges the admissibility of the blood spatter evidence. Specifically, Stewart argues that the trial judge abdicated his duty to independently consider and rule on the defense's trial objection to Morris' testimony. Instead, the trial judge, without any inquiry, blindly adopted the result of a different judge's pretrial ruling rejecting Stewart's motion seeking a *Frye* hearing. Stewart requests a remand so that the district court can hold a *Frye* hearing. The State disagrees and responds that the trial judge made a reasonable decision not to reconsider an issue already decided at an earlier proceeding.

*Standard of Review*

Because the parties frame this issue differently, they disagree on the appropriate standard of review. Stewart asks this court to apply the standard of review used to consider a district court's application of the *Frye* standard for the admissibility of scientific evidence, which would be a de novo review. See *City of Wichita v. Molitor*, 301 Kan. 251, 257, 341 P.3d 1275 (2015) ("[W]hether the district court failed to correctly apply the *Frye* standard for the admissibility of scientific evidence is an abstract question of law subject to de novo review.") (citing *Kuhn v. Sandoz Pharmaceuticals Corp.*, 270 Kan. 443, 455-56, 14 P.3d 1170 [2000]). De novo review is appropriate in such circumstances "because the outcome of a *Frye* holding transcends individual cases such that applying less than a de novo standard could lead to inconsistent treatment of similarly situated claims." *State v. Shively*, 268 Kan. 573, 576, 999 P.2d 952 (2000).

30

The State, on the other hand, contends that the abuse of discretion standard is appropriate because the actual question presented is whether it was reasonable for the trial judge to decline to reconsider a pretrial ruling by a different judge. We agree.

Stewart does not argue the merits of Judge Tatum's pretrial *Frye* ruling, but rather he argues that the trial judge should have reviewed the merits of that prior ruling before applying it at trial. Stewart asks for a remand for another *Frye* hearing, not because the initial ruling on the merits was erroneous, but because of an alleged procedural failure by the trial court. The reconsideration of earlier pretrial rulings is a matter within the trial court's broad discretion. *Cf. State v. Riedel*, 242 Kan. 834, 838, 752 P.2d 115 (1988) ("Reconsideration of earlier pretrial rulings, when necessary to prevent prejudice and assure the parties a fair trial, cannot be said to be an abuse of the trial court's broad discretion."). Consequently, we will apply an abuse of discretion standard of review.

> "'A judicial action constitutes an abuse of discretion if the action (1) is arbitrary, fanciful, or unreasonable; (2) is based on an error of law; or (3) is based on an error of fact.' *State v. Dobbs,* 297 Kan. 1225, 1232, 308 P.3d 1258 (2013) (citing *State v. Ward,* 292 Kan. 541, 550, 256 P.3d 801 [2011], *cert. denied* [565 U.S. 1221] [2012]). A defendant bears the burden to demonstrate the existence of an abuse of discretion. *State v. Baker,* 297 Kan. 482, 484, 301 P.3d 706 (2013)." *State v. Hilt*, 299 Kan. 176, 186, 322 P.3d 367 (2014).

One way in which a defendant can demonstrate the existence of an abuse of discretion is to show that the district court failed to exercise its discretion, either because it refused to do so or because it failed to discern that it was being called upon to exercise discretion. Specifically, we have said:

> "It is an abuse of discretion for a district court to issue a 'blanket ruling' that disposes of a discretionary determination automatically without analyzing the factors that would enter into the discretionary decision; *i.e.,* it is an abuse of discretion to refuse to exercise

discretion or fail to appreciate the existence of the discretion to be exercised in the first place. *Kansas Dept. of Revenue v. Powell,* 290 Kan. 564, 569–70, 232 P.3d 856 (2010). 'A tribunal's failure to exercise its discretionary authority is an abuse of discretion.' *Powell,* 290 Kan. 564, Syl. ¶ 5." *State v. Horton,* 292 Kan. 437, 440, 254 P.3d 1264 (2011).

*Analysis*

At the time of Stewart's trial, a party offering expert opinion testimony based on scientific methods or procedures was required to satisfy the *Frye* test. *In re Girard*, 296 Kan. 372, 372, 294 P.3d 236 (2013). But *cf.* L. 2014, ch. 84, § 2 (amending K.S.A. 60-456(b) with respect to expert testimony on scientific, technical, or other specialized knowledge). The *Frye* test required a "showing that the basis of a scientific opinion is generally accepted as reliable within the expert's particular scientific field." *State v. Shadden*, 290 Kan. 803, 819, 235 P.3d 436 (2010). In other words, expert testimony based upon the results of a new or experimental scientific technique that has not been generally accepted as reliable should not be admitted into evidence. *Kuhn*, 270 Kan. at 454 (citing *State v. Canaan*, 265 Kan. 835, 848, 964 P.2d 681 [1998]). On the other hand, the requirement that the State undertake the burden to satisfy the *Frye* test and prove the reliability of the underlying scientific theory upon which the expert opinion is based arises "[o]nly when there is a doubt as to the scientific reliability of evidence." *Canaan*, 265 Kan. at 849.

As noted above, defense counsel's pretrial motion for a *Frye* hearing sought to exclude both DNA and blood spatter evidence, and it was argued to Judge Tatum at a suppression hearing. Defense counsel argued that, although she had seen the State's DNA evidence and blood spatter analysis, she had not seen the curriculum vitae of the State's experts to assess their qualifications. Nor had she seen any quality assurance protocol or standard operating procedures for the laboratory to assess the reliability of the actual

32

testing. The State countered that the defense was confusing the question of the reliability of the scientific technique involved with the question of whether the general foundational requirements for admitting expert testimony were present and whether generally accepted techniques had been performed in a competent manner.

Judge Tatum ruled for the State, noting that DNA evidence and blood spatter testimony had "been around for a long time" and did not qualify as a "new or experimental scientific technique." On that basis, the court found that the need for a *Frye* test was not triggered. Nevertheless, Judge Tatum said he would keep the issue open in the event defense counsel obtained information that would permit the defense to argue something more than it had presented so far. The court ordered the State to provide the defense with the blood spatter expert's CV, any treatises used by that expert, and the complete crime lab file.

As related above, new defense counsel advised the trial judge that the defense was renewing its pretrial objection to the DNA and blood spatter evidence in order to preserve its challenge with a contemporaneous objection. See K.S.A. 60-404 (contemporaneous objection rule); *State v. King*, 288 Kan. 333, 341-42, 204 P.3d 585 (2009) (statutory contemporaneous objection rule requires timely, specific objection to admission of evidence at trial in order to preserve issues arising from that admission for appellate review). The defense offered no new evidence or argument to cast doubt on the scientific reliability of the techniques, and the trial judge simply adopted "what Judge Tatum had done in the prior hearings."

Stewart complains that it appeared that Judge Ryan did not know the basis of Judge Tatum's ruling and simply adopted the same result without any independent examination of the reasons for the objection. Stewart's argument that he was entitled to have the trial judge consider the merits of his contemporaneous objection is seductive.

33

Even when an issue has been thoroughly argued and ruled upon prior to trial, this court will not consider it on appeal if the defendant did not reassert the challenge at trial with a specific and timely objection. "The purpose of the [contemporaneous objection] rule is to avoid the use of 'tainted evidence [and thereby] avoid possible reversal and a new trial.' [Citation omitted.]" *State v. McCaslin*, 291 Kan. 697, 707, 245 P.3d 1030 (2011). If a contemporaneous trial objection to a pretrial ruling is deemed necessary to avoid the reversible admission of tainted evidence, a corollary to the rule would logically require the trial judge's informed decision on the merits of the objection. Otherwise, without an actual reconsideration of the pretrial ruling, the contemporaneous objection rule would not accomplish our stated purpose.

Moreover, if we invest the trial judge with discretion to determine whether expert testimony is admissible, the failure to exercise that discretion is erroneous. But even if we determine here that Judge Ryan should have exercised his discretion by ruling on the merits of Stewart's objection, rather than automatically adopting the result of the prior ruling without further analysis, Stewart cannot get the relief he seeks.

The defense attorney filing the motion for a *Frye* hearing appeared to concede that DNA testing and blood spatter analysis were not new or experimental techniques and made no other credible argument that would trigger the need for a hearing on the scientific bona fides of those accepted techniques. Nevertheless, Judge Tatum left the door open for the defense to make a colorable claim for a *Frye* hearing, after receiving all of the pertinent information. Yet, at trial, defense counsel did not proffer any additional evidence or argument challenging Judge Tatum's ruling that DNA testing and blood spatter analysis had been around a long time and had been generally accepted practices in his court. Moreover, on appeal, Stewart makes no attempt to explain the error in Judge Tatum's ruling that the defense had not shown why *Frye* testing of well-established procedures was necessary. Consequently, on the record before us, any abuse of discretion

34

by the trial judge in failing to independently consider the merits of Stewart's objection is harmless.

## CUMULATIVE ERROR

Finally, Stewart argues that his convictions should be reversed based on the cumulative effect of the individual trial errors he alleged on appeal. Even if no individual trial error is sufficient to support reversal of a defendant's conviction, the cumulative effect of multiple errors may be so great as to require reversal. *State v. Warren,* 302 Kan. 601, 620, 356 P.3d 396 (2015).

Above, we acknowledged that the record suggested the possibility that the trial court abused its discretion by failing to rule on the merits of the defense objection to testimony about DNA and blood spatter. We also noted that any shortcoming in the jury instruction on the force element of robbery was invited by the defense. But even if we treat those two circumstances as multiple trial errors, a reversal is not appropriate in this case. When faced with a cumulative error claim, this court conducts an unlimited review of the entire record to determine whether the totality of the circumstances establishes that the cumulative effect of trial errors substantially prejudiced the defendant and denied the defendant a fair trial. *State v. Smith*, 296 Kan. 111, 134, 293 P.3d 669 (2012). The errors in this case did not produce that level of prejudice, and reversal is not required.

Affirmed.